# 23-7386-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



BRIDGEPORT MUSIC INC., WESTBOUND RECORDS, INC.,

*Plaintiffs-Counter-Defendants-Appellees,*

*v.*

TUFAMERICA INC., D/B/A TUFF CITY RECORDS, KAY LOVELACE TAYLOR,
INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF LEBARON TAYLOR,

*Defendants-Counter-Claimants-Appellants.*

————————————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

Hillel Ira Parness
PARNESS LAW FIRM, PLLC
*Attorneys for Defendants-Counter-
Claimants-Appellants*
136 Madison Avenue, 6th Floor
New York, New York 10016
212-447-5299



(212) 719-0990
appeals@phpny.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant TufAmerica, Inc. d/b/a Tuff City Records states that it is a New York Corporation. It has no parent company, and no publicly-held company holds more than ten percent of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iii

PRELIMINARY STATEMENT ........................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 7

ISSUES PRESENTED FOR REVIEW ................................................ 8

STATEMENT OF THE CASE ............................................................ 9

STATEMENT OF FACTS ................................................................ 12

SUMMARY OF ARGUMENT ......................................................... 17

ARGUMENT ................................................................................... 19

    I.      STANDARDS OF REVIEW ............................................. 19

    II.    THE DISTRICT COURT ERRED WHEN IT FOUND APPELLEES' COPYRIGHT OWNERSHIP CLAIMS TO BE TIMELY .................................................................... 20

    III.   THE DISTRICT COURT ERRED WHEN IT FOUND APPELLANTS' COUNTERCLAIMS WERE TIME-BARRED ..... 33

         A.    Appellant TufAmerica Was Not On Inquiry Notice In 2011 As To Adverse Claims of Copyright Ownership ................................................................ 33

         B.    Appellant TufAmerica's Predecessor Was Not On Inquiry Notice As To Adverse Claims of Copyright Ownership ................................................................ 37

         C.    The District Court Erred When It Relied On An Unsupported And Contradicted Factual Allegation ............... 42

    IV.   THE RECORD DOES NOT PROVIDE ALTERNATIVE GROUNDS FOR THE DISTRICT COURT TO HAVE GRANTED SUMMARY JUDGMENT TO APPELLEES ON THE COUNTERCLAIMS .............................................. 45

A.     Disputed Material Questions Of Fact As To Copyright Ownership Would Preclude Granting Summary Judgment To Appellees Concerning Appellants' Counterclaims..........................................46

B.     There Is No Basis To Challenge Dr. Oliver's Transfer Of The Rights To TufAmerica, And Certainly No Basis To Grant Summary Judgment To Appellees On The Counterclaims Over This Issue..........................................................................50

CONCLUSION ................................................................52

# TABLE OF AUTHORITIES

## CASES

*23-34 94th St. Grocery Corp. v. New York City Bd. of Health*, 685 F.3d 174 (2d Cir. 2012) .............................................................................32

*Abrams v. Occidental Petroleum Corp.*, 450 F.2d 157 (1971), *aff'd sub nom. Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973) ...... 19, 32

*Aponte v. Perez*, 75 F.4th 49 (2d Cir. 2023) ...........................................................43

*Bey v. City of New York*, 999 F.3d 157 (2d Cir. 2021) ............................................19

*Christians of California, Inc. v. Clive Christian New York*, LLP, 13-cv-0275, 2014 WL 3605526 (S.D.N.Y. July 18, 2014)................................................45

*Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162 (2d Cir. 1991).............32

*Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 979 F. Supp. 2d 456 (S.D.N.Y. 2013) ....................................................................................................... 26, 31

*Devlin v. Transp. Commc'n Int'l Union*, 175 F.3d 121 (2d Cir. 1999) ..................19

*First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109 (2d Cir. 1999).......................................................................................................32

*Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003)........................... 43, 44

*Gorman v. Consol. Edison Corp.*, 488 F.3d 586 (2d Cir. 2007) ............................19

*Holtz v. Rockefeller & Co.*, 258 F.3d 62 (2d Cir. 2001) ........................................43

*Jackson v. Fed. Exp.*, 766 F.3d 189 (2d Cir. 2014) ................................................42

*Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011).................................... 28, 30, 33, 35

*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419 (2d Cir. 2011)........................19

*Latin Am. Music Co. v. Spanish Broad. Sys.*, 232 F. Supp. 3d 384 (S.D.N.Y. 2017) ....................................................................................................... 24, 26, 31

*Latin Am. Music Co. v. The Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 499 F.3d 32 (1st Cir. 2007) ......................................................25

*Lewis v. Westchester Cnty.*, 20-cv-9017, 2023 WL 5610302 (S.D.N.Y. Aug. 30, 2023) ...............................................................................................................42

*Littlejohn v. Artuz*, 271 F.3d 360 (2d Cir. 2001) ...........................................19

*Mackenzie Architects, PC v. VLG Real Ests. Devs., LLC*, 1:15-cv-1105, 2016 WL 4703736 (N.D.N.Y. Sept. 8, 2016).....................................................23

*Mahan v. Roc Nation, LLC*, 14-cv-5075, 2015 WL 1782095 (S.D.N.Y. Apr. 15, 2015), *aff'd*, 634 F. App'x 329 (2d Cir. 2016)............................................. passim

*Margo v. Weiss*, 96-cv-3842, 1998 WL 2558 (S.D.N.Y. Jan. 5, 1998), *aff'd*, 213 F.3d 55 (2d Cir. 2000) ...........................................................................25

*Mason v. Jamie Music Pub. Co.*, 658 F.Supp.2d 571 (S.D.N.Y. 2009) .................26

*Merchant v. Levy*, 92 F.3d 51 (2d Cir. 1996)...........................................................30

*New York v. United Parcel Serv., Inc.*, 15-cv-1136, 2016 WL 10672074 (S.D.N.Y. June 21, 2016)...................................................................................45

*Ortiz v. Guitian Bros. Music Inc.*, 07-cv-3897, 2008 WL 4449314 (S.D.N.Y. Sept. 29, 2008)......................................................................................30

*Potenze v. New York Shipping Ass'n*, 804 F.2d 235 (2d Cir. 1986) ................ 19, 32

*Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55 (1st Cir. 1997) ................................................................................................26

*Silverman v. CBS Inc.*, 632 F. Supp. 1344 (S.D.N.Y. 1986), *decision supplemented*, 675 F. Supp. 870 (S.D.N.Y. 1988), *aff'd in part, vacated in part*, 870 F.2d 40 (2d Cir. 1989)............................................................................23

*Stevens v. City of New York*, 10-cv-2172, 2012 WL 5862659 (S.D.N.Y. Nov. 14, 2012).................................................................................................44

*Travelers Cas. & Sur. Co. v. Gerling Glob. Reinsurance Corp. of Am.*, 419 F.3d 181 (2d Cir. 2005) ................................................................................. 19, 32

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) .................................................19

*Watt v. New York Botanical Garden*, 98-cv-1095, 2000 WL 193626 (S.D.N.Y. Feb. 16, 2000)........................................................................................................43

*Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112 (2d Cir.), *reh'g denied*, 908 F.3d 843 (2d Cir. 2018) ........................................................................ 26, 27, 30

## STATUTES

17 U.S.C. § 101 ..........................................................................................21

17 U.S.C. § 205(c) ........................................................................... passim

17 U.S.C. § 303(b) ......................................................................................22

17 U.S.C. § 410(c) ........................................................................... passim

17 U.S.C. § 501 ............................................................................................7

28 U.S.C. § 1291 ..........................................................................................7

## OTHER AUTHORITIES

S.D.N.Y. Local Civil Rules R. 56.1(d) ...................................................39

## PRELIMINARY STATEMENT

This is an appeal by Defendants-Counter-Claimants-Appellants TufAmerica, Inc. d/b/a Tuff City Records ("TufAmerica") and Kay Lovelace Taylor, Individually and on Behalf of the Estate of Lebaron Taylor ("Dr. Oliver") (together, "Appellants") from a grant of partial summary judgment to Plaintiffs-Counter-Defendants-Appellees Bridgeport Music Inc. ("Bridgeport") and Westbound Records, Inc. ("Westbound") (together, "Appellees") by the United States District Court for the Southern District of New York (SPA1-32), and the subsequent denial of Appellants' motion for reconsideration of that decision. SPA33-53.

This case concerns six musical compositions (the "Compositions") written by non-party George Clinton ("Clinton"), and competing claims by the parties regarding the Compositions, based on competing sets of copyright registrations (with Appellant TufAmerica's registrations – the **senior** registrations – predating any registrations held by Appellees).[1] Appellants sent Appellees a cease-and-desist letter in 2017, and Appellees initiated this case in 2018, seeking a declaratory judgment that they – and not Appellant TufAmerica – owned the Compositions.

---

[1] It is Appellants' position that Clinton conveyed the copyrights in the Compositions to LeBaron Taylor ("Taylor") and that Appellant TufAmerica acquired them from Appellant Dr. Oliver, Taylor's widow and the executor of his estate. It is Appellees' position that Clinton conveyed the copyrights in the Compositions to Appellee Bridgeport.

Appellants then filed declaratory judgment counterclaims of their own, asking the District Court to reach the opposite conclusion. After Appellees moved for summary judgment on both sets of claims, the District Court denied Appellees' motion as to their affirmative claims, but granted Appellees' motion as to Appellants' counterclaims, finding, *inter alia*, that Appellees' claims were **not** barred by the statute of limitations (SPA21-26), but that Appellants' counterclaims **were** barred. SPA27-31. Both of the District Court's conclusions regarding the statute of limitations were erroneous.

The District Court erred when it found that Appellees' claims were **not** barred by the statute of limitations, by failing to find that the copyright registrations upon which Appellants' rely – the **senior** registrations from 1967 and 1968 based on **unpublished** musical compositions – constituted "*prima facie* evidence of the validity of the copyright and of the facts stated in the certificate," pursuant to 17 U.S.C. § 410(c). The District Court also erred by failing to find that those *prima facie* registrations gave Appellees "constructive notice of the facts stated in the recorded document," because "it would be revealed by a reasonable search under the title or registration number of the work," pursuant to 17 U.S.C. § 205(c). The combined effect of Sections 410(c) and 205(c) was to place the whole world – including Appellees – on immediate constructive notice of the **senior** 1967-1968 registrations when they were issued, and certainly no later than when Appellees

- 2 -

started filing applications for the **junior** registrations in 1971, when they would have found the senior registrations through the exercise of basic diligence.

Appellees – the junior registrants – were on inquiry notice no later than 1971, and therefore their time to bring claims sounding in copyright against the senior registrants expired no later than 1974.  The District Court should have found Appellees' claims time-barred.  Had the District Court made the correct finding on this issue, it would not have been beyond the District Court's power to *sua sponte* dismiss **Appellees**' claims, and it should have done so.  Appellant therefore asks this Court to either do so now, or to remand the case with direction that the District Court act accordingly.

The District Court also erred when it found that Appellants' counterclaims **were** barred by the statute of limitations, because there was no basis to conclude that Appellants were placed on inquiry notice of the competing ownership claims before 2017.  The District Court held that Appellant TufAmerica – the holder of the **senior** copyrights – was placed on inquiry notice in 2011, when it purchased the rights to the Compositions from Appellant Dr. Oliver, the widow of the owner of the senior copyright registrations.  The District Court so concluded because, at the time of the sale, Dr. Oliver "did not have documents demonstrating her rights in the Compositions" (SPA9), and because she instructed her attorney to remove a representation from the purchase agreement that would have indicated that she **did**

have such paperwork. The District Court erred by conflating the lack of paperwork showing conveyance of the copyrights from Taylor to his widow with questions regarding whether there was someone else out there affirmatively claiming rights to (and attempting to register) the Compositions. Appellant TufAmerica was not placed on inquiry notice as to copyright ownership in 2011, and the District Court erred in finding that the statute of limitations ran out three years thereafter.

The District Court found, alternatively, that Taylor himself was placed on inquiry notice at some unspecified point in time because he "worked as a radio DJ in Detroit and played the Westbound Sound Recordings on air," a statement in Appellees' Rule 56.1 statement that Appellants admitted. The alleged fact does not have proper support in the record, at least in the manner the District Court interpreted it, and it relies entirely on hearsay testimony by an interested party (Appellees' principal, Armen Boladian ("Boladian")) about the knowledge and state of mind of someone who died 24 years ago (Taylor).

The lone Rule 56.1 statement is also directly contradicted by Appellants' multiple **denials** of other statements in Appellants' Rule 56.1 statement, including Appellants' denial of Appellees' allegations that Taylor knew that Bridgeport claimed ownership of the Compositions, which is the ultimate issue on which the District Court's decision turned. The statement is also contradicted by additional evidence explicitly cited by Appellants, including Clinton's testimony that he told

Boladian that Appellants owned the Compositions, and Clinton's testimony that Boladian knew that Appellants owned the Compositions because Boladian distributed Appellants' versions of the recordings of the Compositions.[2]

The District Court erred by ascribing inquiry notice to the Rule 56.1 allegation, and by declining to overlook the admission despite its lack of support and the body of contrary evidence. Regardless of whether the admission was made due to an oversight by Appellants, both the District Court and this Court should be guided by whether the evidence in the record is sufficient for Appellees to prevail on their claims, in the absence of any other disputed questions of material fact. The District Court erred by dismissing Appellants' counterclaims as time-barred and that ruling should be reversed.

Aside from its errors with respect to the statute of limitations issues, the District Court correctly denied Appellees' motion as to the substance of their affirmative claims, because "there are material issues of fact that preclude resolving ownership as a matter of law," in that Appellants "have offered evidence that creates material issues of fact as to ownership of the Compositions." SPA13, 15. This conclusion is equally applicable to Appellant's mirror-image counterclaims, and thus there is no other basis on which this Court should affirm the District Court's

---

[2] Clinton and Boladian are both alive and available for cross-examination.

partial grant of Appellees' motion.

Appellants respectfully request that this Court reverse each of the District Court's rulings with respect to the statutes of limitation and find that Appellees' claims **are** time-barred, but that Appellants' counterclaims are **not**, and reverse the District Court's grant of partial summary judgment to Appellees with respect to Appellants' counterclaims. Appellants further request that this Court *sua sponte* grant summary judgment to Appellants with respect to Appellees' claims, or remand the case to the District Court with instructions to so rule.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 17 U.S.C. § 501, *et seq*. Final judgment was entered on September 15, 2023. SPA54. Appellant timely noticed its appeal from the judgment on October 13, 2023. A777. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      Whether, by Memorandum Opinion and Order dated July 26, 2023 (SPA1-32), the District Court erroneously concluded that Appellees' copyright ownership claims were timely, despite the fact that the 1967-1968 copyright registrations introduced by Appellants for unpublished musical compositions were *prima facie* evidence of the validity of the copyrights upon which Appellants were relying, placing Appellees on inquiry notice no later than 1971, pursuant to 17 U.S.C. §§ 410(c) and 205(c).

2.      Whether, by Memorandum Opinion and Order dated July 26, 2023 (SPA1-32), and again by Order dated September 10, 2023 (SPA33-53), the District Court erroneously concluded that Appellants' counterclaims **were** time-barred, despite the fact that Appellants were not placed on inquiry notice in 2011 or in the 1970s, and the District Court relied upon allegations without record support.

3.      Whether, by Memorandum Opinion and Order dated July 26, 2023 (SPA1-32), the District Court erroneously granted Appellees' motion for summary judgment as to Appellants' counterclaims.

4.      Whether, by Order dated September 10, 2023 (SPA33-53), the District Court erroneously denied Appellants' motion for reconsideration of the July 26, 2023 Memorandum Opinion and Order.

## STATEMENT OF THE CASE

Appellees initiated this case on January 11, 2018, with the filing of a Complaint in the United States District Court for the Eastern District of Michigan. A24-48. On February 20, 2019, the case was ordered transferred to the United States District Court for the Southern District of New York. A10 (ECF 20-21). On April 11, 2019, Appellants answered the Complaint and interposed Counterclaims. A11 (ECF 28). On May 8, 2019, Appellants filed the Amended Answer and Counterclaims. A49-110.

On November 8, 2021, Appellees moved for summary judgment on their claims and Appellant's counterclaims.[3] The motion was fully-briefed as of January 17, 2022. A19-20 (ECF 98-105); A133-707. On July 26, 2023, the District Court issued a Memorandum and Order in which it denied Appellees' motion as to Appellees' claims, but granted Appellees' motion as to Appellants' counterclaims. SPA1-32. In so finding, the District Court found that Appellees' claims **were not** time-barred (SPA21-26), but that Appellants' counterclaims **were** time-barred. SPA27-31. The District Court explained its reasoning as follows ("Defendants" and "Plaintiffs" refer to Appellants and Appellees, respectively):

> [W]hile Defendants assert that the Compositions were first published in 1967 or 1968, and have submitted six images of vinyl record labels

---

[3] In accordance with the District Court's "bundling rule," all of the papers in connection with the motion were filed on January 18, 2022.

for the Compositions, none of these images show the year of the Composition's release. (Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-10, 104-12, 104-14, 104-16)) **If Defendants are correct that the Compositions were first published in 1967 or 1968, their registrations would be entitled to a presumption of validity. But Defendants have not submitted reliable evidence concerning the date of first publication**.

….

Even if Plaintiffs' copyright registrations were entitled to a presumption of validity, Plaintiffs would not be entitled to summary judgment, because **Defendants have offered evidence that creates material issues of fact as to ownership of the Compositions**.

….

In sum, **Taylor's registration of copyrights in the Compositions is not sufficient to trigger accrual of Plaintiffs' rights in the Compositions**. The Court concludes that Plaintiffs' claims are not time-barred under the Copyright Act's three-year statute of limitations.

….

Because (1) Defendants' ownership claims accrued in 2011 at the latest, and (2) the instant lawsuit was not initiated until 2018, Defendants' counterclaims are time-barred under the Copyright Act's three-year statute of limitations.

SPA15, 19, 26, 31 (emphasis added).

On August 9, 2023, Appellants moved for reconsideration of the District Court's July 26, 2023 decision to the extent that it granted summary judgment to

Appellees with respect to Appellants' counterclaims.[4]  That motion was fully-briefed as of August 23, 2023.  A21-22 (ECF 112-15); A741-54.  On September 10, 2023, the District Court denied Appellants' motion for reconsideration, reiterating its holding that Appellants' counterclaims were time-barred.  SPA33-53.

On September 15, 2023, the District Court ordered the conditional dismissal of Appellees' claims, subject to reinstatement if Appellants prevail in this appeal. SPA54.  On October 13, 2023, Appellants filed the Notice of Appeal from the July 26, 2023 and September 10, 2023 orders of the District Court, as made final by the September 15, 2023 order granting conditional dismissal.  A777.

---

[4] Appellants also sought, in the alternative, leave to take an interlocutory appeal to this Court, which request was effectively mooted by the District Court's grant of Appellees' request for conditional dismissal.

## STATEMENT OF FACTS

This case concerns six musical Compositions written by non-party George Clinton:

1. "I'll Stay" a/k/a "I'll Wait"

2. "Let's Make It Last"

3. "The Goose (That Laid the Golden Egg)"

4. "Can You Get To That" a/k/a "What You Been Growing"

5. "Good Old Music"

6. "The Victor" a/k/a "Baby I Owe You Something Good"

A599 ¶ 3. Appellants maintain that Clinton conveyed the rights in the Compositions to the late LeBaron Taylor in or about 1965. A648 ¶ 134.

Taylor registered at least five of the six Compositions (in his name or one of his companies' names) with the United States Copyright Office, **as unpublished works,** in 1967 and 1968):

| Date | Composition | Registration No. | Registrant | Appendix Cite |
|---|---|---|---|---|
| 1/25/1967 | "I'll Stay" a/k/a "I'll Wait" | EU976770 | Groovesville Music | A646-48 ¶ 133; A580-83. |
| 8/9/1967 | "Let's Make It Last" | EU8922 | LeBaron Taylor | A646-48 ¶ 133; A575-77. |
| 11/29/1967 | "The Goose (That Laid the Golden Egg)" | EU27528 | LeBaron Music | A646-48 ¶ 133; A591-93. |

| 11/29/1967 | "Can You Get To That" a/k/a "What You Been Growing" | EU27527 | LeBaron Music | A646-48 ¶ 133; A586-88. |
| 5/31/1968 | "Good Old Music" | EU56256 | LeBaron Taylor | A646-48 ¶ 133; A567-69. |

Taylor died in 2000. A664 ¶ 156; A628 ¶ 100. Appellants maintain that Taylor's widow, Appellant Dr. Oliver, conveyed the copyrights in the Compositions to Appellant TufAmerica via two written transactions in 2011 and 2019. A655-57 ¶¶ 139-42 & A548-54, 55-57.

Appellees disagree. They dispute that Clinton conveyed any rights to Taylor in 1965, and claim instead that Clinton conveyed the rights to Appellees in a series of six agreements dated between 1967 and 1991. A603-08 ¶¶ 21-32; A338-410. From 1971 to 1975, Appellees applied for copyright registrations for the same five Compositions for which Taylor had already secured registrations in 1967 and 1968 (Appellees filed an application for the sixth Composition in 1991).

| Date | Composition | Registration No. | Registrant | Appendix Cite |
|---|---|---|---|---|
| 2/16/1971 | "Good Old Music" | EU232643 | Bridgeport | A612 ¶ 45; A419-21. |
| 9/8/1971 | "Can You Get To That" a/k/a "What You Been Growing" | EU274894 | Bridgeport | A618 ¶ 67; A443-51. |
| 10/17/1973 | "Let's Make It Last" | EU438646 | Bridgeport | A614 ¶ 52; A427-29. |
| 10/9/1974 | "I'll Stay" a/k/a "I'll Wait" | EU891961 | Bridgeport | A616 ¶ 59; A438-40. |

| 6/30/1975 | "The Goose (That Laid the Golden Egg)" | EU597869 | Clinton (renewed by Bridgeport) | A620 ¶ 72; A263-64. |
| 11/4/1991 | "The Victor" a/k/a "Baby I Owe You Something Good." | PA0000557896 | Bridgeport | A610-11 ¶ 39; A411-13. |

Clinton's testimony supported Appellants' position (that he conveyed the rights to Taylor), rather than Appellees' (that he conveyed the rights to Appellees). A649-51 ¶ 135; A513:13-21; A514:24-A515:2; A516:22-A517:2; A518:8-11; A519:8-16; A535:2-4; A535:22-25; A538:21-A539:5.

In fact, Clinton testified that he did not convey to Appellees anything that he had already conveyed to Taylor, and that the agreements upon which Appellees rely **were not signed by Clinton**. A651-53 ¶¶ 136-37; A661-63 ¶¶ 147-54; A545:13-16; A522:16-19; A543:14-15; A524:18-25; A534:18-21; A528:1-15; A535:11-13; A529:20-23; A530:16-18 ("It's my signature but it was a cut and paste."); A536:16-A537:9.

Appellees assert – via the testimony of their principal Armen Boladian – **that the late Mr. Taylor knew** that Clinton had conveyed the rights in the Compositions to Appellees. A622 ¶ 81 (disputed). This is contradicted, however, by Clinton's own testimony **that Boladian knew** that Clinton had in fact conveyed the rights to Taylor, and not Appellees, both because Boladian was Groovesville's distributor

- 14 -

**and because Mr. Clinton told him**. A659-61 ¶¶ 145-46; A520:25-A521:22; A545:13-21.

Taylor's November 1, 1999 Last Will and Testament (A558-62) contains the following relevant provisions (A665 ¶¶ 158-61):

- It makes a series of specific bequests, none of which are of musical compositions (A559-61);

- It directs the distribution of the "residuary estate" in equal portions to Taylor's four children (A561); and

- It nominates Dr. Oliver as executor, assuming she is able to serve. A561-62.

On August 9, 2011, Appellant TufAmerica, on the one hand, entered into an exclusive administration agreement with Appellant Dr. Oliver, individually and on behalf of Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, Groovesville Music, Brute Records, The Estate of LeBaron Taylor and all other companies owned and/or controlled by the Estate (the "2011 Agreement"). A655-56 ¶ 139 & A548-54. The 2011 Agreement memorialized Appellant TufAmerica's purchase of 50% of the rights to, *inter alia*, the Compositions. A656 ¶ 140 & A548-54. On December 9, 2019, Appellants entered into a second agreement, on behalf of the same parties as the 2011 Agreement, by which Appellant TufAmerica purchased the remaining 50% of the rights to, *inter alia*, the Compositions (the "2019 Agreement"). A656-57 ¶¶ 141-42 & A555-57.

- 15 -

Appellant Dr. Oliver testified that she entered into the two agreements with Appellant TufAmerica on behalf of Taylor's children – her stepchildren (A658-59 ¶ 144):

> A:    Quite frankly, being a novice, legally I felt that what was left in the home was our property, his children and mine.  And when I found them, of course not knowing, I sought assistance with what it was, found out that they were recordings of many artists, you know, early on, and I thought, Oh, well, this might be of value to my stepchildren.

A475:11-20.

> A:    I thought the reels had some value. My stepchildren deserved to have the benefits of everything that their father obtained and so I pursued it that way, thinking that there were royalties or there might be something here. It was exciting.

A479:6-12

> A:    …The initial involvement was to provide my stepchildren with royalties I thought that may arise….

A492:1-3.

## SUMMARY OF ARGUMENT

On Appellees' motion for summary judgment with respect to Appellees' claims and Appellants' mirror-image counterclaims, the District Court denied summary judgment as to Appellees' claims due to the presence of material questions of disputed fact as to ownership of the Compositions, but granted summary judgment as to Appellants' counterclaims on statute of limitations grounds. Fundamentally, the District Court found Appellees' claims **not** to be time-barred, but Appellants' mirror-image counterclaims **to be** so barred. Both of these conclusions were erroneous and should be reversed. Because Appellees' claims – and not Appellants' counterclaims – are untimely, the grant of partial summary judgment with respect to the counterclaims should be reversed, and the Court should *sua sponte* grant summary judgment to Appellants on Appellees' claims, or direct the District Court to do so.

The District Court erred when it found Appellees' claims **not** to be time-barred, because it failed to properly apply 17 U.S.C. §§ 410(c) ("the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate") and 205(c) ("[r]ecordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document"), the combined effect of which was to place Appellees on notice of Appellants' claims

of ownership as early as 1967, and no later than 1971.

The District Court also erred when it found Appellants' counterclaims **to be** time-barred, on the theory that inquiry notice arose either in 2011, when Appellant TufAmerica purchased 50% of the rights from Appellant Dr. Oliver, or at some unspecified time when Appellees' principal Boladian allegedly gave copies of his sound recordings to the late Mr. Taylor to play on the radio. The District Court erred in finding either set of allegations to constitute inquiry notice, and further erred in relying on factual assertions made by Appellees that are without support in the record. There is no other basis on which to grant summary judgment to Appellees on the counterclaims, as the District Court correctly found material questions of disputed fact concerning copyright ownership, which apply equally to Appellees' and Appellants' mirror-image claims.

## ARGUMENT

## I.     STANDARDS OF REVIEW

The District Court's decision on Appellees' motion for summary judgment (SPA1-32) is reviewed *de novo*. *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021) (citations omitted); *United States v. Aiyer*, 33 F.4th 97, 113-14 (2d Cir. 2022) (citations omitted). The District Court's denial of Appellants' motion for reconsideration (SPA33-53) is reviewed for abuse of discretion, except to the extent it implicates questions of law, which are reviewed *de novo*. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 435 (2d Cir. 2011) (*citing Devlin v. Transp. Commc'n Int'l Union*, 175 F.3d 121, 131-32 (2d Cir. 1999); *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 592 (2d Cir. 2007); *Littlejohn v. Artuz*, 271 F.3d 360, 362 (2d Cir. 2001)).

As discussed below, this Court is empowered to grant (or direct the District Court to grant) summary judgment to Appellants on a *sua sponte* basis, if it concludes that Appellees "cannot establish any material issue of fact requiring further proceedings." *Travelers Cas. & Sur. Co. v. Gerling Glob. Reinsurance Corp. of Am.*, 419 F.3d 181, 190 (2d Cir. 2005) (*citing Potenze v. New York Shipping Ass'n*, 804 F.2d 235, 239 (2d Cir. 1986); *Abrams v. Occidental Petroleum Corp.*, 450 F.2d 157, 165-66 (1971), *aff'd sub nom. Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973)).

- 19 -

## II. THE DISTRICT COURT ERRED WHEN IT FOUND APPELLEES' COPYRIGHT OWNERSHIP CLAIMS TO BE TIMELY

The District Court denied summary judgment to Appellees on their affirmative copyright ownership claims, but granted it with respect to Appellants' mirror-image copyright ownership counterclaims, finding the former **timely**, and the latter **untimely**, under the three-year statute of limitations applicable to copyright ownership claims.

The District Court's conclusion with respect to Appellees' claims was erroneous, having been built on a faulty premise. The District Court began its analysis of the issue by quoting, but then misapplying, 17 U.S.C. § 410(c):

> In any judicial proceedings the certificate of a registration made **before or within five years after first publication** of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

SPA13 (emphasis added).

The District Court, focusing on the words "within five years after first publication," but apparently overlooking the words "before or," then set out to determine whether the record revealed when Appellants' claimed each the Compositions was first published, and whether each of those dates fell within the respective five-year periods following registration:

> [W]hile Defendants assert that the Compositions were first published in 1967 or 1968, and have submitted six images of vinyl record labels

for the Compositions, none of these images show the year of the Composition's release. (Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-10, 104-12, 104-14, 104-16)) **If Defendants are correct that the Compositions were first published in 1967 or 1968, their registrations would be entitled to a presumption of validity. But Defendants have not submitted reliable evidence concerning the date of first publication**.

….

In sum, **Taylor's registration of copyrights in the Compositions is not sufficient to trigger accrual of Plaintiffs' rights in the Compositions**. The Court concludes that Plaintiffs' claims are not time-barred under the Copyright Act's three-year statute of limitations.

SPA15, 19 (emphasis added).

The District Court's approach to the timeliness of Appellees' claims was flawed, and led to a series of erroneous conclusions of law. First, Appellants did not "assert that the Compositions were first published in 1967 or 1968" by virtue of the release of sound recordings. There is nothing in any pleading or record to support that statement, and the District Court cited none. Appellants certainly did not assert that the Compositions were "published" as defined by the Copyright Act, nor could they have done so.

Although "publication" is currently defined as "the distribution of **copies or phonorecords** of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," 17 U.S.C. § 101 (emphasis added), it is also the case that "[t]he distribution **before January 1, 1978**, of a phonorecord shall not for any

purpose constitute a publication of any musical work, dramatic work, or literary work embodied therein." 17 U.S.C. § 303(b) (emphasis added). Even if Appellants had asserted "publication" of the Compositions in 1967 or 1978 by release of sound recordings, those releases would not constitute "publication" under the Copyright Act.

Rather, and completely consistently with the foregoing, the 1967-1968 copyright registrations upon which Appellant relies were all filed based on **unpublished** works, which is made clear by the fact that they used the "EU" form, received "EU" registrations, and left the publication information blank, as instructed, for example:





A580-83.  *See also* A567-69; A575-77; A586-88; A591-93.[5]

Under 17 U.S.C. § 410(c), therefore, each of these registrations – for **unpublished** musical compositions – were all made "**before**…first publication of the work," which means that they each "constitute **prima facie evidence** of the validity of the copyright and of the facts stated in the certificate."  The District Court's holding to the contrary was erroneous, and led to further errors.

Having established that the 1967-1968 registrations **should have been** deemed *prima facie* evidence supporting Appellants, 17 U.S.C. § 205(c) instructs in pertinent part that "[r]ecordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document [if (1)] it

---

[5] *See Mackenzie Architects, PC v. VLG Real Ests. Devs., LLC*, 1:15-cv-1105, 2016 WL 4703736, at \*9, \*13 n. 5 (N.D.N.Y. Sept. 8, 2016) ("The Court will find, for the purposes of the instant motion, that the Plaintiff has alleged that the architectural drawings in question were **unpublished**….Thus, the Court will consider the registrations as *prima facie* evidence of validity for purposes of the instant motion.") (emphasis added); *Silverman v. CBS Inc*., 632 F. Supp. 1344, 1351 (S.D.N.Y. 1986), *decision supplemented*, 675 F. Supp. 870 (S.D.N.Y. 1988), *aff'd in part, vacated in part*, 870 F.2d 40 (2d Cir. 1989) ("CBS registered these **unpublished** radio scripts with the Copyright Office….In the absence of any evidence rebutting this presumption of validity, we conclude that CBS holds valid copyrights in the post-1948 radio scripts") (emphasis added).

would be revealed by a reasonable search under the title or registration number of the work; and (2) registration has been made for the work."  The 1967-1968 *prima facie* registrations were recorded, included the titles of the works, and self-evidently were registered.  As such, the 1967-1968 registrations gave "all persons constructive notice" of the contents of the registrations, *i.e.* that the copyrights in the Compositions were owned by Taylor and his companies.  The District Court should have come to this conclusion, and should have determined that Appellees were on notice of the 1967-1968 registrations, triggering the statute of limitations **against Appellees** on any ownership claims.

This approach finds support in multiple decisions from this Circuit.  In *Latin Am. Music Co. v. Spanish Broad. Sys.*, 232 F. Supp. 3d 384 (S.D.N.Y. 2017) (Sullivan, J.), the district court held as follows:

> Here, there is no dispute that one of two entities other than Plaintiffs – Fania Publishing or Fania Records – registered copyrights for each of the Fania Works in the 1970s, decades before any purported transfer of copyright ownership to Plaintiffs. (Def. 56.1 ¶ 59.) Thus, **whether the three-year statute of limitations began to run in the 1970s, when the songs at issue were first registered by a Fania entity, or in the late 1990s and early 2000s, when Plaintiffs filed their own registrations for the same works**, Plaintiffs' ownership claims to the Fania Works were clearly time-barred by the time Plaintiffs commenced this action in 2013.

*Id*. at 390 (emphasis added).  Thus, the *Latin American Music* court explained that where registrations by someone other than the party claiming ownership predated the lawsuit by more than three years, the discovery rule is implicated.

- 24 -

Similarly, in 2015, the district court dismissed copyright ownership claims as

untimely pursuant to § 205(c), and this Court affirmed that decision:

> First, Plaintiff's claims are time barred as a result of Roc-A-Fella's
> registrations with the United States Copyright Office. Roc-A-Fella
> recorded its copyrights in the Albums in three separate registrations,
> dated February 28, 2000; April 12, 2000; and December 11, 2000.
> None of these registrations mentioned Plaintiff as a joint copyright
> holder. The Copyright Act provides that "[r]ecordation of a document
> in the Copyright Office gives all persons constructive notice of the
> facts stated in the recorded document." 17 U.S.C. § 205(c). Under the
> Copyright Act, the three-year statute of limitations begins to run when
> a "copyright certificate listing [defendants] as authors [i]s filed."
> *Margo v. Weiss*, No. 96 CIV. 3842(MBM), 1998 WL 2558, at *5
> (S.D.N.Y. Jan. 5, 1998), *aff'd*, 213 F.3d 55 (2d Cir.2000).
> **Accordingly, no later than December 11, 2000, Plaintiff had
> constructive notice of Roc-A-Fella's assertion that it exclusively
> held the Albums' copyrights**.

*Mahan v. Roc Nation, LLC*, 14-cv-5075, 2015 WL 1782095, at *3 (S.D.N.Y. Apr.

15, 2015) (emphasis added), *aff'd*, 634 F. App'x 329 (2d Cir. 2016).

Likewise in 2013, the district court held that where a plaintiff had secured

copyright registrations in 2008, the defendant's purported assignor was on

constructive notice from that point, and thus the limitations period had expired in

2011:

> Here, the duly issued copyright registration put the world on
> constructive notice of CSI's copyright in BankTrade 8.0. *See* 17
> U.S.C. § 205(c) (explaining that recordation of a document in the
> Copyright Office "gives all persons constructive notice of the facts
> stated in the recorded document ..."); *Latin Am. Music Co. v. The
> Archdiocese of San Juan of the Roman Catholic & Apostolic Church*,
> 499 F.3d 32, 40 (1st Cir. 2007) (explaining that a copyright
> registration provides constructive notice as to ownership claimed as

well as the facts set forth in the registration itself) (citations omitted); *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc*., 119 F.3d 55, 66 (1ˢᵗ Cir. 1997) ("A copyright registration certificate issued by and filed with the Copyright Office thus serves to put the world on constructive notice as to the ownership of the copyright and of the facts stated in the registration certificate."); *Mason v. Jamie Music Pub. Co*., 658 F.Supp.2d 571, 588 (S.D.N.Y. 2009) (*citing Latin American Music Company* for the proposition that a copyright registration certificate in the Copyright Office provides constructive notice as to the ownership of the copyright and the facts stated in the registration certificate).

**Thus, as of 2008 when CSI obtained its copyright registration for BankTrade 8.0, IT was on constructive notice** that if it intended to assert rights to ownership, it needed to act. It did not.

*Complex Sys., Inc. v. ABN Ambro Bank N.V*., 979 F. Supp. 2d 456, 472 (S.D.N.Y. 2013) (emphasis added).

The District Court responded to Appellants' argument by writing that "[t]he Second Circuit has rejected the notion that a copyright registration alone can put a putative owner on notice of an adverse claim of ownership" (SPA25-26), citing to a pair of 2018 decisions by this Court in *Wilson v. Dynatone*, 17-1549-cv (2018). In *Wilson*, however, this Court did not state an unequivocal rule, but rather qualified its holding to the "circumstances" before it, and the circumstances of *Wilson* are materially different than those presented by this case, and indeed than those presented by the *Latin American Music*, *Mahan*, and *Complex Systems* decisions discussed above, which may help explain why each of those cases **did** find that

registration triggered constructive notice, and the statute of limitations, for copyright ownership claims.

The *Wilson* case is distinguishable, first and foremost, because it concerned questions as to whether notice arising during an original copyright term also constituted notice as to the renewal term, and this Court decided that question in the negative, explaining:

> Here, the copyright notice on the 1973 record label and Defendants' 1974 copyright registration occurred during the original term. Construing the facts alleged in the complaint most favorably to Plaintiffs, as required on a motion attacking the sufficiency of the complaint, those acts, while they may have repudiated Plaintiffs' claim to the initial terms, did not repudiate Plaintiffs' ownership of the renewal terms.

*Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 118 (2d Cir.), *reh'g denied*, 908 F.3d 843 (2d Cir. 2018).

This Court made sure to point out, by contrast, that defendants "do not challenge the district court's dismissal of their claims to the original term copyrights or their demand for a declaratory judgment invalidating the June 26, 1974 copyright," because the notice arising during the original term **had** triggered the statute of limitations, which then ran out. *Id*. at 117. With respect to the claims concerning the renewal term, this Court explained:

> Defendants rely on Defendant UMG's 2001 registration of a renewal term copyright in the *sound recording*, and the sampling of the Sho' Nuff recording without paying royalties, which began on or about January 15, 2013. Neither fact supports a finding that this action is

time-barred. **At least in these circumstances**, UMG's registration of the renewal term with the Copyright Office did not amount to a repudiation of the Plaintiffs' claim triggering their obligation to bring suit. If mere registration of a copyright without more sufficed to trigger the accrual of an ownership claim, then **rightful owners would be forced to maintain constant vigil over new registrations**. Such a requirement would be vastly more burdensome than the obligations that "a reasonably diligent plaintiff" would undertake. *Kwan*, 634 F.3d at 228 (internal citation and quotation marks omitted). **Authors would regularly lose their rights merely by virtue of failing to monitor**. The mere fact of UMG's 2001 registration did not cause Plaintiffs' claims to accrue.

*Id*. at 119 (italics in original, emphasis added).

This Court qualified the holding upon which the District Court relies with the words "[a]t least in these circumstances." We understand this Court to have been pointing out at least two things: First, the Court's italicization of the words "sound recording" appears to signal the Court's concern that the defendant was pointing to their registration of a "sound recording," whereas the case concerned musical compositions.

Second, this Court was contemplating the question of whether, when a senior party already has a registration on the books and a junior party comes along and files a new registration, the **junior** registration triggers the **senior** party's statute of limitations to bring an ownership claim against the **junior** party. This Court answered that question in the negative, explaining that the impact of such a rule would be that "rightful owners would be forced to maintain constant vigil over new registrations" lest they "lose their rights merely by virtue of failing to monitor."

This Court then reiterated its view: "Nonetheless, as explained above, the mere act of **registering an adverse claim** in the Copyright Office was not an effective repudiation. An author is not under a duty to constantly monitor filings in the Copyright Office on pain of **losing her copyright**." *Id*. (emphasis added). The Court was focused on the fact pattern before it, where a senior copyright registrant brought an ownership claim against a junior registrant, with the junior registrant arguing that the senior registrant's limitations period expired three years after the **junior** registration. Under those circumstances, this Court reasoned, the junior registration standing alone – "registering an **adverse** claim" – would not trigger the limitations period to the detriment of the senior registrant, who would have no reason to monitor new registrations and could not be expected to do so, "[a]t least in these circumstances."

In its decision a few months later denying defendants' petition for rehearing, the Court reiterated that its ruling was limited to the facts before it, and reiterated its reasoning:

> We reject Defendants' argument that, **at least in the circumstances of this case**, registration, without more, triggers accrual of an ownership claim. Their interpretation of § 205(c) would mean that after authoring a work, **an author would need to constantly monitor** the Copyright Office registry to be sure that no one has registered a spurious claim of authorship, on pain of losing their ownership of the copyright three years after the spurious registration. Defendants' interpretation would thus **impose on authors an intolerable and unrealistic burden**, and would open fertile opportunities for thieves

- 29 -

to steal copyrights by simply filing baseless registrations for
previously created works.

*Wilson*, 908 F.3d at 844 (emphasis added).  This Court's reasoning – both times –
turned on concerns regarding the burden that would fall on the **senior** registrant to
be on the lookout "for thieves to steal copyrights," requiring them to monitor all new
copyright registrations for new adverse claimants, as the mere filing of the copyright
application would trigger the start of a three-year statute of limitations.[6]

The facts before the Court now, however, are entirely opposite, implicating
none of the concerns raised by this Court in *Wilson*.  Appellant TufAmerica is the
successor-in-interest to the **senior** copyright registrant and registrations secured in
1967 and 1968.  In accordance with *Wilson*, Taylor, and later Appellants, were under
no obligation to constantly monitor copyright filings for junior adverse claimants, as
that would impose an unreasonable burden on them.  Appellees, however, are the
**junior** registrants.  No unreasonable burden would be implicated by requiring

_____

[6] The other cases referenced by the District Court involved senior registrants
seeking to foreclose ownership claims brought by junior registrants on statute of
limitations grounds, and in each case the claims were barred.  *See Merchant v.
Levy*, 92 F.3d 51, 52 (2d Cir. 1996) ("appeal concerns the appropriate time period
in which those claiming to be co-authors of a work whose copyright is registered to
another person may sue"); *Kwan v. Schlein*, 634 F.3d 224, 227 (2d Cir. 2011)
("Schlein and BRB jointly registered their copyright in FIOL on January 15,
1999….on January 14, 2005, Kwan filed this lawsuit….The next month, Kwan
filed a copyright registration"); *Ortiz v. Guitian Bros. Music Inc*., 07-cv-3897,
2008 WL 4449314, at *3 (S.D.N.Y. Sept. 29, 2008) ("defendant holds a prior
copyright registration certificate for the disputed work").

Appellees to search the Copyright Office records before filing new applications, where they surely would have found the original slate of registrations. *Wilson* has no application to this situation, whereas *Latin American Music*, *Mahan*, and *Complex Systems* all speak directly to the fact pattern currently before the Court, and all indicate that the statute of limitations on any claims brought by Appellees – the junior registrants – against Appellants – the successors to the senior registrants – were untimely.

When Taylor secured copyright registrations for **unpublished** musical compositions in 1967 and 1968 ("made before…first publication of the work"), those registrations became *prima facie* evidence of validity in accordance with 17 U.S.C. § 410(c), and they served as constructive notice to all persons including Appellees, in accordance with § 205(c). As Appellees **also** claim to have first acquired their rights from Clinton in 1967, when they would be expected to have engaged in minimal due diligence, there should be no question that they had three years from 1967 to assert any ownership claims against Appellants or their predecessors. At the latest, following the logic of *Latin American Music*, 232 F. Supp. 3d at 390, the statute of limitations would have started to run in 1971, when Appellees "filed their own registrations for the same works." Having failed to assert their claims within three years, Appellees' 2018 copyright ownership claims were

untimely. The District Court's decision to the contrary was error, and should be reversed.

Had the District Court reached the correct conclusion on this issue, it would have been well within the court's discretion to grant summary judgment to Appellants *sua sponte*. *23-34 94th St. Grocery Corp. v. New York City Bd. of Health*, 685 F.3d 174, 180 n. 6 (2d Cir. 2012) ("a district court has the ability to grant summary judgment in favor of a party that has not moved for summary judgment") (*citing First Fin. Ins. Co. v. Allstate Interior Demolition Corp*., 193 F.3d 109, 114-15 (2d Cir. 1999); *Coach Leatherware Co. v. AnnTaylor, Inc*., 933 F.2d 162, 167 (2d Cir. 1991)).

Indeed, **this Court** can grant summary judgment to Appellants (or direct the District Court to do so) if it concludes that Appellees "cannot establish any material issue of fact requiring further proceedings." *Travelers Cas. & Sur. Co. v. Gerling Glob. Reinsurance Corp. of Am*., 419 F.3d 181, 190 (2d Cir. 2005) (*citing Potenze v. New York Shipping Ass'n*, 804 F.2d 235, 239 (2d Cir. 1986); *Abrams v. Occidental Petroleum Corp*., 450 F.2d 157, 165-66 (1971), *aff'd sub nom. Kern County Land Co. v. Occidental Petroleum Corp*., 411 U.S. 582 (1973)). *See Abrams*, 450 F.2d at 165 ("[a]lthough defendant did not move for summary judgment, it asks us to instruct the district court to enter one in its favor, as we clearly have power to do").

Appellants respectfully request that this Court reverse the holding of the District Court, find Appellees' claims untimely, and grant (or direct the grant of) summary judgment on those claims in favor of Appellants.

## III. THE DISTRICT COURT ERRED WHEN IT FOUND APPELLANTS' COUNTERCLAIMS WERE TIME-BARRED

The District Court deemed Appellants counterclaims untimely because "Defendants' counterclaims accrued either in the 1970s, when Plaintiffs implicitly repudiated Defendants' ownership of the Compositions, or at the latest in 2011 when Defendants purchased Oliver's rights in the Compositions." SPA27 (citing *Kwan*, 634 F.3d at 228). This conclusion, like the District Court's conclusion that Appellees' claims **were** timely, was erroneous.

### A. Appellant TufAmerica Was Not On Inquiry Notice In 2011 As To Adverse Claims of Copyright Ownership

The District Court erred when it concluded that Appellant TufAmerica was on inquiry notice as to the issue of copyright ownership in the Compositions at the latest in 2011, when TufAmerica purchased 50% of the interest in the Compositions from Dr. Oliver, Taylor's widow and his estate's executor.

It is undisputed that Dr. Oliver did not "did not have documents demonstrating her rights in the Compositions" (SPA9), and that she instructed her attorney to remove language from the deal documents where she would have represented otherwise. The District Court made the unfounded extrapolation that TufAmerica –

the successor to the **senior** copyright holder – was on inquiry notice as to ownership claims from **junior** usurpers:

> Despite Oliver's expressed concern that she lacked documents **showing Taylor's ownership interest in the Compositions** (Busch Decl., Ex. 2 (Oliver Dep.) (Dkt. No. 100-1) at 28), Fuchs did not search the copyright catalog for registrations until a "few years" after purchasing a 50% share of Oliver's interest in the Compositions.

SPA30 (emphasis added).

> Given Fuchs' knowledge of the music industry, and the price he paid Oliver, the notion that Fuchs was not on inquiry notice that another party might have claimed ownership of the Compositions "strains credulity."

SPA31 (*quoting Mahan*, 2015 WL 1782095, at *4).

As discussed above, the District Court made a fundamental error when it failed to recognize that the copyright registrations upon which TufAmerica relies – the **senior** registrations secured in 1967 and 1968 for unpublished musical compositions – are in fact "*prima facie* evidence of the validity of the copyright and of the facts stated in the certificate," providing "all persons constructive notice of the facts stated in the recorded document. 17 U.S.C. §§ 410(c), 205(c). Indeed, the original copyright registrations for the unpublished works are – literally – "documents showing Taylor's ownership interest in the Compositions."

Once the District Court failed to recognize the *prima facie* validity of the registrations, it erred again when it held that registrations can **never** serve to place others (in this case Appellees) on inquiry notice, when the prior rulings from this

Court appear quite clearly to distinguish the two situations: **Junior** registrations should **not** place senior registrants on notice, because that would require senior registrants to maintain constant and unending vigilance. Whereas **senior** registrants can and should enjoy the full benefit of Sections 410(c) and 205(c), placing all potential junior registrants on notice and placing upon them the obligation to check. When TufAmerica purchased the first half of the rights, it stepped into the shoes of Taylor, the **senior** copyright holder from 1967. As senior holder, TufAmerica should not be expected to run searches, and to suffer a running limitations period, any more than Taylor himself would have been expected to do so back in 1967.

In *Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011), a Second Circuit case cited by the District Court in support of its overall conclusion, the defendants (a publisher and an author) had hired the plaintiff (an editor) to edit a book in 1998. That same year – 1998 – the plaintiff made a claim of authorship directly to the defendants. The defendants rejected the claim and filed a copyright registration in 1999. In 2005, plaintiff sued defendants, **after which** plaintiff filed a copyright registration. The court found plaintiff's claims untimely, having been on inquiry notice since 1998, when she made her initial demand of defendants **as to her authorship**, the disputed issue.

The facts of the present case are significantly different. Although there is evidence that Dr. Oliver made her concerns known to TufAmerica, those concerns

related to Dr. Oliver's ability to prove that she was the rightful heir of Taylor with respect to the Compositions, and did not speak at all to whether Taylor's rights, derived from the *prima facie* **senior** copyright registrations, were in any way flawed or challenged. To put it another way, although it might be fair to say that TufAmerica was on inquiry notice as to whether Dr. Oliver held the rights following Taylor's death in 2000 (and that TufAmerica ran a risk with respect to that issue), there was nothing about TufAmerica's interaction with Dr. Oliver that placed TufAmerica on inquiry notice as to any cloud over the **senior** rights that Clinton conveyed to Taylor in 1965. There was certainly nothing suggesting that someone was claiming to have secured those same rights from Clinton **after** Taylor had already done so and secured *prima facie* copyright registrations in 1967 and 1968.

The District Court quoted *Mahan v. Roc Nation, LLC*, No. 14 CIV. 5075 LGS, 2015 WL 1782095 (S.D.N.Y. Apr. 15, 2015), *aff'd*, 634 F. App'x 329 (2d Cir. 2016), to support its view that TufAmerica's failure to investigate "strains credulity," but the use of that quote is misplaced here. *Mahan*, as discussed above, was a case brought by a **junior** claimant against the senior holder of the copyrights, and the court found that the **junior** claimant's failure to check for **prior registrations** doomed its claims:

> Roc-A-Fella recorded its copyrights in the Albums in three separate registrations, dated February 28, 2000; April 12, 2000; and December 11, 2000….Accordingly, no later than December 11, 2000, Plaintiff

had constructive notice of Roc-A-Fella's assertion that it exclusively
held the Albums' copyrights.

*Mahan*, 14 CIV. 5075 LGS, 2015 WL 1782095, at *3.

Appellant TufAmerica's 2011 purchase of 50% of Taylor's interest in the
Compositions, arising from the **senior**, *prima facie* copyright registrations, did not
place TufAmerica on inquiry notice with respect to subsequent adverse claims of
ownership of the Compositions, and did not trigger the statute of limitations with
respect to Appellants' counterclaims.

### B. Appellant TufAmerica's Predecessor Was Not On Inquiry Notice As To Adverse Claims of Copyright Ownership

The District Court concluded, alternatively, that the late LeBaron Taylor was
on inquiry notice from some point in the 1970s when Appellees' principal allegedly
delivered copies of Appellees' recordings of the Compositions to Taylor to play on
the radio.

Focusing on the 1970s period, the Court wrote: "[i]t is undisputed that, after
the Revilot bankruptcy, Taylor worked as a disc jockey in Detroit, and played
Westbound's sound recordings of the Compositions on the radio. (Def. R. 56.1
Counterstmt. (Dkt. No. 105) ¶ 20) Accordingly, Taylor was aware that the
Compositions were being exploited by another record company." SPA28.
Defendants respectfully submit that the Court is adopting Plaintiffs' recitation of

facts that are not in the evidence. The Court cites Statement of Material Fact # 20, which reads – in its entirety – as follows:

> Mr. Taylor worked as a radio DJ in Detroit and played the Westbound Sound Recordings on air. Busch Decl. ¶ 5 (Deposition of Boladian 18:16-23); Boladian Decl. ¶¶ 15-17.

A603 ¶ 20. The first citation, to the deposition of Mr. Boladian (Appellees' principal), reads – in its entirety – as follows:

> Q    And when did you meet LeBaron Taylor for the first time?
>
> A    I can't remember the first time, but LeBaron Taylor was an air personality in Detroit, local Detroit radio station, and then he formed Revilot Records, which we distributed for him. And, I mean, I've known him, you know, before even at the record label because he was a D.J. and **we would take records over to promote them at their – at his – at the radio station he worked for**, along with other stations in the area.

A226 (emphasis added).

The quoted language, including the emphasized language, does not say that Boladian brought records **to Taylor**, but rather to "the radio station he worked for." It certainly does not say that Taylor **played** any records that Boladian brought to the station (his testimony was it was done "to promote them"), let alone that he played **the** records embodying the Compositions. Boladian said no such thing at his deposition, giving Appellants' counsel no reason to challenge him on it.

The final citation, to Boladian's declaration submitted in support of Appellees' motion, reads – in its entirety – as follows:

- 38 -

15.     In the 60s and 70s, Taylor was a radio personality and DJ at a local Detroit radio station, WCHB in Inkster, Michigan.

16.     When Taylor worked at the radio station, I would take him Westbound records to play and promote them at the radio station he worked for, along with other radio stations in Detroit.

17.     I took him the sound recordings that Clinton recorded for Westbound **to play and promote** at his radio station.

A317-18 (emphasis added).

Once again, the cited language, including the emphasized language that goes slightly beyond Boladian's prior testimony, neither says that Taylor was **aware** of the records that Boladian brought him (alleged recordings of the Compositions), nor does it say that say that Taylor **played** those records.  Even if we assume that Boladian's testimony was that he took **those** records to Taylor, and even if we assume that Boladian's testimony was that Taylor played **those** records or even that Taylor was aware of **those** records, any testimony on the part of Boladian as to what Taylor did is impossible to challenge at this stage, because Taylor has been deceased since 2000, and any testimony on the part of Boladian as to what Taylor allegedly said, **let alone believed or knew**, would be inadmissible hearsay and should be excluded from consideration.  *See* S.D.N.Y. Local Civil Rules 56.1(d) ("[e]ach statement…must be followed by citation to evidence **which would be admissible**") (emphasis added).  It certainly should not have formed the basis of a ruling dismissing Appellants' counterclaims in their entirety as untimely.

Appellants were not focused on the 1970s, in part, because **Appellees** did not base their statute of limitations argument on that period, but rather 2011. *See* S.D.N.Y. ECF 99 at 23 ("TufAmerica's ownership claim accrued **seven years** prior to Plaintiffs' filing in 2018 when they, undisputedly and with due diligence, should have discovered the alleged infringement of the Bridgeport Compositions") (emphasis in original). That is not to say of course that the District Court exceeded its mandate, but with the hindsight afforded by the Court's interpretation of Boladian's testimony, Appellants recognize that they could have more finely parsed the grammar of Appellees' Rule 56.1 statement ("and played") and Boladian's deposition ("to promote") and declaration ("to play and promote"), and could have – and should have – **disputed** Paragraph 20 of the Rule 56.1 on this basis and because it relies on inadmissible hearsay. The cited evidence, which at best says that Boladian "brought records" to Taylor, is insufficient and should not have formed the basis to dismiss Appellants' claims.

And Appellants certainly **did and do** dispute any implication that Taylor **knew** of the Westbound re-recordings of the Compositions, as reflected throughout Appellants' Rule 56.1 response:

> 81. Mr. Taylor knew that Bridgeport claimed ownership of the Bridgeport Compositions. / Busch Decl. ¶ 5 (Deposition of Boladian 20:20-24, 63:6-8); Boladian Decl. ¶¶ 16-18.
>
> **Response:** Disputed. To the contrary, Mr. Clinton testified repeatedly that he told Mr. Boladian that the Compositions were published by

Groovesville, and that Mr. Boladian knew that independently as the distributor of Groovesville's records. Parness Dec. ¶ 5 & Ex. C (Clinton Tr.) at 81:25-82:22; 145:13-21. Defendants further dispute the statement because Boladian 20:20-24 does not support the alleged fact in any fashion, and Boladian 63:6-8 does not say what Plaintiffs purports it says. Defendants further dispute the statement because it is based entirely on hearsay and lacks foundation.

82. Mr. Taylor knew that Mr. Clinton recorded the Westbound Sound Recordings for Westbound and that Westbound claimed ownership of them. / Busch Decl. ¶ 5 (Deposition of Boladian 20:20-24, 63:6-8); Boladian Decl. ¶¶ 18-19.

**Response:** Disputed. To the contrary, Mr. Clinton testified repeatedly that he told Mr. Boladian that the Compositions were published by Groovesville, and that Mr. Boladian knew that independently as the distributor of Groovesville's records. Parness Dec. ¶ 5 & Ex. C (Clinton Tr.) at 81:25-82:22; 145:13-21. Defendants further dispute the statement because Boladian 20:20-24 does not support the alleged fact in any fashion, and Boladian 63:6-8 does not say what Plaintiffs purports it says. Defendants further dispute the statement because it is based entirely on hearsay and lacks foundation.

83. Mr. Taylor never challenged Bridgeport's ownership of the Bridgeport Compositions or Westbound's ownership of the Westbound Sound Recordings throughout his entire life. / Busch Decl. ¶ 5 (Deposition of Boladian 20:20-24, 63:6-8); Boladian Decl. ¶¶ 18-19.

**Response:** Disputed. To the contrary, Mr. Clinton testified repeatedly that he told Mr. Boladian that the Compositions were published by Groovesville, and that Mr. Boladian knew that independently as the distributor of Groovesville's records. Parness Dec. ¶ 5 & Ex. C (Clinton Tr.) at 81:25-82:22; 145:13-21. Defendants further dispute the statement because Boladian 20:20-24 does not support the alleged fact in any fashion, and Boladian 63:6-8 does not say what Plaintiffs purports it says. Defendants further dispute the statement because it is based entirely on hearsay and lacks foundation.

A622-23 ¶¶ 81-83.[7]

### C. The District Court Erred When It Relied On An Unsupported And Contradicted Factual Allegation

As discussed above, the District Court's conclusion that Appellant TufAmerica's predecessor – the late Mr. Taylor – was put on inquiry notice some time in the 1970s, was based on a single allegation from Appellees' Rule 56.1 statement that Appellants admitted. Also as discussed above, with the hindsight that comes with understanding how the District Court understood it, Appellants' could have and likely should have denied the allegation, as it is not supported by the record and because the admission is contradicted by multiple denials by Appellants in the same Rule 56.1 response.

Under these circumstances, the District Court should not have relied upon that admission to dismiss Appellants' counterclaims. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 194-95 (2d Cir. 2014) ("Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed."); *Lewis v. Westchester Cnty.*, 20-cv-9017, 2023 WL 5610302, at \*4 (S.D.N.Y. Aug. 30, 2023) ("'uncontested fact[s] cannot be deemed

---

[7] Appellants argued to the District Court (and reiterate to this Court) that Clinton's testimony that Boladian knew that the Compositions were already published because, *inter alia*, Clinton **told him so**, provides another basis to conclude that Appellees were on inquiry notice with respect to any affirmative copyright ownership claims more than three years before they filed suit.

true simply by virtue of their assertion in a Local Rule 56.1 statement' – in the absence of citations or 'where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion.'") (*quoting Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (*quoting Watt v. New York Botanical Garden*, 98-cv-1095, 2000 WL 193626, at *1 n. 1 (S.D.N.Y. Feb. 16, 2000))).

As this Court decided just a few months ago in an analogous situation, "[t]he absence of any evidence of the existence of a relevant court order creates a genuine dispute of material fact and does not allow us to infer that Aponte's confinement was privileged....we conclude that the district court's grant of summary judgment on the basis of privilege, at this stage, was improper." *Aponte v. Perez*, 75 F.4th 49, 60 (2d Cir. 2023).

Similarly, back in 2003, this Court reversed a district court for its improper reliance on a single alleged fact in a Rule 56.1 statement:

> The district court accepted that Oliver's arrest (and accompanying search) occurred prior to Giannullo's arrest, **based solely on the fact that plaintiff's Rule 56.1 counter-statement did not controvert the aspect of paragraphs 14 and 15 of defendants' Rule 56.1 statement that placed the Oliver arrest prior to the Giannullo arrest. But nothing in the record evidences this sequence.** Defendants' sole citation in support of paragraph 14 (relating to the Oliver arrest) is to the inventory of the items seized from Oliver, **which nowhere states the time of Oliver's arrest** or any relation between it and Giannullo's arrest. Similarly, defendants' sole citation in support of paragraph 15 (relating to the Giannullo arrest) is to the police report of Giannullo's arrest, which indicates he was arrested at

8:05 a.m. but **does not indicate at what time Oliver was arrested** or, indeed, anything about Oliver's arrest at all.

It follows that the record does not support the district court's determination that defendants were entitled to summary judgment as a matter of law, either on the basis of probable cause or qualified immunity. Accordingly, for the reasons set forth above, the judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.

*Giannullo v. City of New York*, 322 F.3d 139, 142-43 (2d Cir. 2003) (emphasis added).

Appellees may point out that Appellants did not bring the issues surrounding the admission of paragraph 20 of the Rule 56.1 statement before the District Court in opposition to Appellees' motion.  As discussed above, that can be explained by the fact that Appellees were arguing for notice inquiry in 2011, and by the fact that Appellants did not interpret Appellees' allegations in the way that the District Court ultimately did.  Irrespective, the District Court was not foreclosed, and this Court certainly is not foreclosed, from reviewing the entire record to come to the correct decision. The situation is comparable to one faced by the district court in *Stevens v. City of New York*, No. 10-cv-2172, 2012 WL 5862659 (S.D.N.Y. Nov. 14, 2012). In *Stevens*, the court determined that even though the defendants raised an issue in their reconsideration motion that they had neglected to raise previously, the court would employ its discretion and grant the motion, explaining:

Were the Court not to revisit its earlier decision, the outcome of the issue is so clear that the Court would have to grant a motion for

directed verdict on the same basis at the close of plaintiff's case.
**Requiring litigants to present – and jurors to listen to – a case that simply cannot succeed, is not what our law intends.**

*Id*. *1 (emphasis added) (granting reconsideration and partially granting defendant's motion for summary judgment); *see also New York v. United Parcel Serv., Inc*., 15-cv-1136, 2016 WL 10672074, at *2 (S.D.N.Y. June 21, 2016) ("the Court believes that it is preferable, at this pre-trial stage, to reach the correct legal conclusion on the merits of this particular motion rather than to have the parties re-litigate the motion to strike at the Second Circuit after a lengthy trial in this Court"); *Christians of California, Inc. v. Clive Christian New York*, LLP, 13-cv-0275, 2014 WL 3605526, at *3 (S.D.N.Y. July 18, 2014) ("granting the plaintiff's motion rather than requiring renewal of the motion to amend expedites a determination on the merits and furthers the interests of finality and conservation of judicial resources").

Appellants respectfully request that the Court find the counterclaims to be timely, and to reverse the District Court's partial grant of summary judgment and dismissal of the counterclaims on statute of limitations grounds.

## IV. THE RECORD DOES NOT PROVIDE ALTERNATIVE GROUNDS FOR THE DISTRICT COURT TO HAVE GRANTED SUMMARY JUDGMENT TO APPELLEES ON THE COUNTERCLAIMS

Appellees can be expected to argue that there are grounds other than statute of limitations on which the District Court could have granted summary judgment to Appellees with respect to Appellants' counterclaims. Leaving aside the statute of

limitations issues, which should result in dismissal of Appellees' claims and preservation of Appellants' counterclaims, the District Court considered all of Appellees' arguments and correctly concluded that material questions of fact precluded the District Court from granting summary judgment to Appellees on their claims. The same disputed issues of material fact that led the District Court to conclude that Appellees had not proven that Appellees owned the Compositions also dictate the conclusion that Appellees cannot prove at summary judgment that Appellants do **not** own the Compositions.

### A. Disputed Material Questions Of Fact As To Copyright Ownership Would Preclude Granting Summary Judgment To Appellees Concerning Appellants' Counterclaims

Appellees argued to the District Court that it was "undisputed" that Appellee Bridgeport acquired the Compositions from Clinton, as reflected in a series of agreements between Clinton and Bridgeport and Bridgeport's exploitation of the Compositions after the supposed acquisitions. S.D.N.Y. ECF 99 at 15. Appellants demonstrated, and the District Court held, that material questions of disputed fact were threaded through the parties' competing ownership claims.

Appellees are not entitled to summary judgment on Appellants' counterclaims because Appellants' position on ownership is backed up by significant evidence in the record. Appellees' ownership position is supported by two things: a series of

written agreements that they purport to have with Clinton, and a series of copyright registrations for the Compositions reflecting ownership by Appellee Bridgeport.

The various agreements on which Appellees rely were detailed in their Statement of Material Facts. Appellants disputed every single one of those allegations regarding Appellees' agreements (A603-10 ¶¶ 21-35), for several reasons:

First, Clinton – a non-party with no vested interest in the outcome of this case – testified that he conveyed the rights in the Compositions by written agreement to **Taylor** – not Appellee Bridgeport – in 1965, all before any of the agreements and copyright registrations upon which Appellees rely. A648-51 ¶¶ 134-35 & A513:13-21; A514:24-A515:2; A516:22-A517:2; A518:8-11; A519:8-16; A535:2-4; A535:22-25; A538:21-A539:5; A545:13-16.

Second, consistent with Clinton's conveyance of his rights to Taylor in 1965, Taylor filed federal copyright registrations for at least five of the Compositions in 1967 and 1968, all before any of the agreements and copyright registrations upon which Appellees rely. A646-48 ¶ 133 & A567-69; A575-77; A580-83; A586-88; A591-93.

Third, consistent with Clinton's conveyance of his rights to Taylor in 1965 and the registration of the copyrights for the Compositions in 1967-1968, the labels on the original recordings of the six songs reflect ownership consistent with the

1967-1968 copyright registrations.  A653-55 ¶ 138 & A563-64; A565-66; A573-74; A578-79; A589-90.

Fourth, Clinton testified repeatedly that he did not sign any of the agreements upon which Appellees rely.  A661-63 ¶¶ 147-54 & A513:13-21; A514:24-49:2; A516:22-A517:6; A518:8-19; A534:14-A535:4; A535:16-25; A538:21-A539:5.

As discussed above (and contrary to the District Court's conclusion), Appellants' senior copyright registrations, based on unpublished musical compositions, are treated as "*prima facie* evidence of the validity of the copyright and of the facts stated in the certificate," providing "all persons constructive notice of the facts stated in the recorded document.  17 U.S.C. §§ 410(c), 205(c). Appellees' junior registrations are not entitled to any such deference.

The District Court's analysis of Appellees' motion with respect to their copyright ownership claims is equally applicable to the motion with respect to the mirror-image counterclaims.  The District Court held, *inter alia*, that:

> Plaintiffs dispute the validity and effect of Defendants' copyright registrations, given Plaintiffs' own copyright registrations [but] Plaintiffs have not cited any case in which a court has granted a copyright claimant summary judgment in the face of competing, seemingly valid, and earlier copyright registrations regarding the same works.

SPA16.

Plaintiffs' copyright registrations have no presumption of validity.

SPA17.

- 48 -

[W]hile (1) Plaintiffs contend that a written agreement assigning rights in the Compositions to Taylor "is a requirement for Defendants' actions to have a shot at succeeding"…. it is Plaintiffs and not Defendants who bear the burden of proof here.

SPA17

The evidence proffered by Defendants is sufficient to create a material issue of fact as to whether Plaintiffs hold valid copyrights in the Compositions. As discussed above, Defendants have proffered copyright registrations that predate Plaintiffs' copyright registrations, and show title passing from Clinton to Taylor or Taylor-affiliated entities.

SPA17.

Clinton's testimony that he did not sign many of the agreements on which Plaintiffs rely creates a material issue of fact as to Plaintiffs' claim of ownership…. Clinton's testimony merely highlights the lack of clarity in the evidence regarding ownership of the Compositions.

SPA18-19.

Acknowledging that Plaintiffs have "openly exploited" and collected royalties on the Compositions for decades, Defendants have proffered copyright registrations for the Compositions, have presented sound recordings of the Compositions, and have offered testimony from the author in which he denies conveying the copyrights in the Compositions to Plaintiffs.

SPA20.

Each of the foregoing findings contributed to the District Court's conclusion "there are material issues of fact that preclude resolving ownership as a matter of law" (SPA13), a conclusion that applies equally to Appellees' claims of ownership and Appellants' mirror-image claims of ownership. The same material issues of fact that precluded the District Court from finding that Appellees own the Compositions

(a decision that Appellees do not appeal) would also preclude the District Court from finding that Appellants do **not** own those same Compositions. In the event that this Court agrees with Appellants and reverses the District Court's holding that Appellants' counterclaims are untimely, the Court should deny Appellees' motion for summary judgment with respect to the counterclaims, in view of the material issues of disputed fact concerning ownership of the Compositions.

**B.** **There Is No Basis To Challenge Dr. Oliver's Transfer Of The Rights To TufAmerica, And Certainly No Basis To Grant Summary Judgment To Appellees On The Counterclaims Over This Issue**

Appellees also argued to the District Court that even if Taylor – and not Bridgeport – had acquired the Compositions from Clinton, Taylor did not convey them to Dr. Oliver, and therefore Dr. Oliver did not convey them to TufAmerica. S.D.N.Y. ECF 99 at 20-22. Appellees took the position that the transfer from Dr. Oliver to TufAmerica because the rights were not hers to convey under Taylor's Last Will and Testament (the "Will") (A558-62). Appellees' position is wrong, and in any event their argument brings up material questions of disputed fact that correctly prevented the District Court from granting Appellees' motion as to their claims, and would similarly prevent granting the motion as to the counterclaims.

The Will directs the disposition of specific property to specific people, and directs that the "residuary estate be distributed to" Taylor's four children, who were Dr. Oliver's step-children. (A665 ¶¶ 157-58 & A475:11-20; A479:3-12; A492:1-3;

A558-62). Appellees argued that any intellectual property rights would have fallen into the residuary estate, and therefore could not have been owned by Dr. Oliver, and therefore could not have been sold by Dr. Oliver to TufAmerica. Even if that reading of the Will were correct, as the Compositions were owned by Taylor at the time of his death, Dr. Oliver was well within her rights and power to sell them to TufAmerica as Executor of the estate, with obligations to the estate and to her step-children as beneficiaries of the estate. A665-66 ¶¶ 158-62 & A558-62.

Each of the agreements between Dr. Oliver and TufAmerica states that Dr. Oliver was acting not only in her personal capacity, but expressly "o/b/o herself, Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound Productions, LeBaron Music, Groovesville Music, Brute Records, **The Estate of LeBaron Taylor and all other companies owned and/or controlled by the Estate**." A655-57 ¶¶ 139-142 & A548-55 (2011 Agreement), A555-57 (2019 Agreement) (emphasis added). Consistent with her role as Executor, and the language of the Will and the two agreements, Dr. Oliver testified repeatedly that she sold the rights to TufAmerica in two tranches for her stepchildren, who were the beneficiaries of the residuary estate. A657-59 ¶¶ 143-44 & A475:11-20; A479:3-12; A492:1-3. All of the unrebutted and undisputed evidence – the Will, the 2011 Agreement, the 2019 Agreement and Dr. Oliver's testimony – supports Appellants' position on this issue,

and certainly is sufficient to constitute a material question of disputed fact that precludes granting summary judgment to Appellees on the counterclaims.

## CONCLUSION

Both of the District Court's rulings regarding statute of limitations (SPA21-26; SPA27-31), along with the District Court's grant of summary judgment to Appellees with respect to Appellants' counterclaims (SPA31-32), and its denial of Appellants' motion for reconsideration (SPA53), were erroneous and should be reversed. In addition, because Appellees' claims should be dismissed as untimely, this Court should *sua sponte* grant summary judgment to Appellants and dismiss Appellees' claims, or should remand the case to the District Court with instructions to do so.

January 26, 2024

Respectfully submitted,

/s/

HILLEL I. PARNESS
PARNESS LAW FIRM, PLLC
136 Madison Ave., 6th Floor
New York, New York 10016
(212) 447-5299
hip@hiplaw.com
*Counsel for Appellants*
  *TufAmerica, Inc. d/b/a*
  *Tuff City Records and*
  *Kay Lovelace Taylor*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32(a), I hereby certify that the foregoing brief was produced using the Times New Roman 14-point typeface and contains 11,544 words.

_____
/s/
Hillel I. Parness

SPECIAL APPENDIX

**<u>Table of Contents</u>**

<u>**Page**</u>

Memorandum Opinion and Order of the Honorable
Paul G. Gardephe, dated July 26, 2023, Appealed From ............... SPA1

Order of the Honorable Paul G. Gardephe,
dated September 10, 2023, Appealed From .................................. SPA33

Order of the Honorable Paul G. Gardephe Conditionally
Dismissing Plaintiffs' Claims, dated September 15, 2023,
Appealed From ............................................................................. SPA54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIDGEPORT MUSIC, INC. and
WESTBOUND RECORDS, INC.,

        Plaintiffs / Counterclaim-
Defendants

          - v -

TUFAMERICA, INC. d/b/a TUFF CITY
RECORDS, and KAY LOVELACE
TAYLOR, individually and on behalf of the
Estate of LeBaron Taylor,

        Defendants / Counterclaim-
Plaintiffs.

      **MEMORANDUM
OPINION & ORDER**

      19 Civ. 01764 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      In this action, Plaintiffs and Counterclaim-Defendants Bridgeport Music, Inc. and

Westbound Records, Inc. seek a declaratory judgment that (1) Plaintiffs are the rightful owners

of certain George Clinton musical compositions (the "Compositions"); (2) Defendants do not

have any valid ownership claims in the Compositions; and (3) Plaintiffs have not infringed upon

any copyrights allegedly owned by Defendants in the Compositions.  (Cmplt. (Dkt. No. 1))

      Defendants TufAmerica, Inc. and Kay Lovelace Taylor have asserted

counterclaims for (1) a declaratory judgment that TufAmerica is the rightful owner of the

Compositions; (2) copyright infringement; and (3) an accounting of damages caused by

Plaintiffs' alleged unauthorized commercial exploitation of the Compositions.  (Am. Ansr. (Dkt.

No. 32) ¶¶ 53-68)

      Plaintiffs have moved for summary judgment on their claims and Defendants'

counterclaims.  (Pltf. Mot. (Dkt. No. 98); Pltf. Br. (Dkt. No. 99))  For the reasons stated below,

Plaintiffs' motion will be granted in part and denied in part.

## BACKGROUND[1]

### I.    FACTS

Plaintiffs are affiliated music companies based in Detroit, Michigan, and distributed soul and funk music in the late 1960s and early 1970s.  (See Pltf. R. 56.1 Stmt.  (Dkt. No. 100) ¶¶ 1-2, 4-7)  Plaintiffs were founded and are owned by Detroit music producer Armen Boladian.  (See id. ¶ 8)

Defendant TufAmerica, Inc. is a record label incorporated in New York.  (Id. ¶ 9)  Defendant Kay Lovelace Taylor, a/k/a Dr. Kay Oliver ("Oliver") is the widow of LeBaron Taylor.  (Id. ¶ 10)  LeBaron Taylor, who died in 2000, was a music producer, radio disc jockey, and record company executive.  He owned Revilot Records, a Detroit-based record label that went bankrupt in the late 1960s.  (Id. ¶¶ 11, 20, 100)

Renowned funk musician George Clinton – a non-party to this lawsuit – is the author or co-author of the Compositions: (1) "The Victor" a/k/a "Baby I Owe You Something Good"; (2) "Good Old Music"; (3) Let's Make It Last"; (4) "I'll Wait" a/k/a "I'll Stay; (5) "Can You Get To That" a/k/a "What You Been Growing"; and (6) "The Goose (That Laid the Golden Egg)."  (Id. ¶ 3)

The parties agree that Clinton recorded music for Revilot in the late 1960s prior to Revilot's bankruptcy and pursuant to a 1965 agreement between Clinton and Revilot (the

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).  Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)

"Revilot Agreement"). (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 134-35) The Revilot

Agreement has not been submitted to the Court. However, Clinton testified about the Revilot

Agreement at his June 2021 deposition. (See Parness Decl., Ex. C ("Clinton Dep.") (Dkt. No.

104-3) at 47-49)[2] Although Clinton did not have a copy of the Revilot Agreement and did not

recall many of its key terms, he testified that the agreement contained a "publishing component"

that involved an entity called "Groovesville." (Id. at 48-49) As is discussed in more detail

below, the evidence is not clear as to Groovesville's relationship with Revilot or the terms of any

agreements between or among Revilot, Groovesville, and Clinton.

> Defendants cite to five copyright registrations dated between 1967 and 1968 as

evidence of their ownership of the Compositions:

- "Good Old Music," United States Copyright Registration number EU56256, registered to LeBaron Taylor and dated May 31, 1968 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. I (Dkt. No. 104-9));

- "Let's Make it Last," United States Copyright Registration number EU8922, registered to LeBaron Taylor and dated August 9, 1967 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. K (Dkt. No. 104-11));

- "I'll Wait," (a/k/a "I'll Stay") United States Copyright Registration number EU976770, registered to Groovesville Music and dated January 25, 1967 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. M (Dkt. No. 104-13));

- "What You Been Growing" (a/k/a "Can You Get To That"), United States Copyright Registration number EU27527, registered to LeBaron Music, dated November 29, 1967 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. O (Dkt. No. 104-15)); and

- "The Goose (That Laid the Golden Egg)," (a/k/a "The Goose") United States Copyright Registration number EU27528, registered to LeBaron Music dated

---

[2] Except as to deposition transcripts, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system. With respect to deposition transcripts, the Court cites to the page numbers originally assigned by the court reporter.

November 29, 1967 (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Ex. Q (Dkt. No. 104-17)).

As to "The Victor" (a/k/a "Baby, I Owe You Something Good"), Defendants claim ownership based on an image of a vinyl record label of a sound recording entitled "(I Owe You) Something." (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 39; Parness Decl., Ex. G (Dkt. No. 104-7)) Defendants cite this image (and images of other vinyl record labels bearing the Compositions' titles) as evidence that Taylor, or companies affiliated with him, also made and sold sound recordings of the Compositions in 1967 and 1968.[3] (Id. ¶ 138)

Revilot entered bankruptcy in the late 1960s (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 17-18), and Clinton then began recording music for Plaintiff Westbound Records. (Id. ¶ 18) The Compositions – except for "The Goose" – were then re-recorded by Clinton and his band, Funkadelic, and released on various Westbound Records albums during the 1970s. (Id. ¶¶ 36, 42, 49, 56, 64) "The Goose" was recorded by Clinton and another band, Parliament, and released by non-party Casablanca Records in 1974. (Id. ¶ 70) Plaintiffs have not alleged that they purchased any copyrights in Compositions or sound recordings from Taylor, Revilot, or any other affiliated entity.

Plaintiffs have submitted a series of agreements, dated between 1967 and 1991, in which Clinton, his publishing company, Malbiz Music, and certain co-writers assigned ownership in the Compositions to Bridgeport Music and exclusive recording rights to Westbound

---

[3] Plaintiffs dispute that Defendants' images of vinyl record labels support the statement that Taylor released the records in the late 1960s. (Pltf. R. 56.1 Resp. (Dkt. No. 102) ¶ 138) Drawing all factual inferences in favor of Defendants, as the Court must on Plaintiffs' motion for summary judgment, the images of vinyl record labels tend to support the factual assertion that Taylor and/or his companies released the records. See Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) ("'[The Court] resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"). The Court acknowledges that the record labels do not indicate when the records were released.

Records (the "Bridgeport/Westbound Agreements"). (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 21-

30) The Bridgeport/Westbound Agreements are as follows:

- **1967 Bridgeport Music Agreement:**  Plaintiffs allege that on November 10, 1967, Clinton entered into an agreement wherein he assigned and transferred all rights in the Composition "Good Old Music" to Bridgeport. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 21)

- **August 1, 1971 Bridgeport Music Agreement:**  Plaintiffs allege that on August 1, 1971, Clinton and co-writer Ernie Harris, entered into an agreement wherein they assigned and transferred all rights in the Composition "Can You Get to That" to Bridgeport. (Id. ¶ 23)

- **August 31, 1971 Bridgeport Music Agreement:**  Plaintiffs allege that on August 31, 1971, Clinton entered into an agreement wherein he "assigned to Bridgeport an undivided one-half interest in all rights to music compositions previously and/or subsequently written by [] Clinton, alone or in collaboration with others, and recorded by Westbound, during a period of five years from the date of **the agreement.**" (Id. ¶ 22)

- **1972 Westbound Records Agreement:**  Plaintiffs allege that on August 30, 1972, Clinton, individually and as a member of the group Funkadelic, entered into an exclusive sound recording agreement with Westbound Records. (Id. ¶ 24)

- **The 1974 Bridgeport Music Agreement**:  Plaintiffs allege that on June 6, 1974, Clinton and a co-writer entered into an agreement wherein they sold, assigned, and transferred all rights in the Composition "I'll Stay" to Bridgeport Music. (Id. ¶ 27)

- **The 1975 Westbound Records Agreement**:  Plaintiffs allege that in 1975, Clinton and Westbound Records entered into an agreement providing that Westbound Records "'shall retain in perpetuity the exclusive worldwide right, title, and interest in and to all master recordings and the copyrights thereon embodying the performances of the Group delivered to us [Westbound Records] prior to the date of this Agreement. . . .'" (Id. ¶ 28 (quoting Boladian Decl., Ex. 10 (Dkt. No. 100-2) at 33))

- **The 1983 Bridgeport Music Agreement:**  Plaintiffs allege that on December 2, 1983, Clinton entered into an "Addendum" to a 1982 Agreement[4] with Bridgeport Music in which he "assign[ed] to [Bridgeport Music] all musical compositions previously written by George Clinton (prior to March 4, 1982) or such percentage of said musical compositions not vested by a binding written agreement in another

---

[4]  The alleged 1982 agreement has not been submitted to the Court.

publisher." (See Boladian Decl., Ex. 11, (Dkt. No. 100-2) at 38-39; Pltf. R. 56.1 Stmt (Dkt. No. 100) ¶ 29)

- **The October 18, 1991 Agreement:** Plaintiffs allege that on October 18, 1991, Plaintiffs purchased the rights to "The Goose" from a third-party record label, which "recognized that Bridgeport owns an undivided one half interest in the copyright to certain musical compositions recorded by Mr. Clinton for Casablanca," the third-party's predecessor in interest, including "The Goose." (Pltf. R. 56.1 Stmt (Dkt. No. 100) ¶ 31)

Defendants dispute the validity of the Bridgeport/Westbound Agreements, pointing to Clinton's deposition testimony, in which he stated that he did not sign most of these agreements or does not recall signing these agreements. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 21-30; see generally, Clinton Dep. (Dkt. No. 103-3) at 86-101)

Clinton testified that he recalled signing only a "contract label" agreement with Bridgeport/Westbound at some point between 1970 and 1972, and "some songwriter's agreements":

> Q. You did sign certain agreements with Bridgeport, correct?
> A. Certain songwriter's agreement and a '71 or '72 contract label, I think somewhere around in there, yes.
> Q. So you signed certain agreements with Bridgeport and certain agreements with Westbound?
> A. Yes. One agreement that's '72 or '70 – with Westbound and some songwriter's agreements, blank songwriter's agreements.

(Clinton Dep. (Dkt. No. 104-3) at 94)

As to other Bridgeport/Westbound Agreements, Clinton testified that he either did not sign, or did not recall signing, them:

> Q. And this is a songwriter agreement between you and Bridgeport Music from November of 1967 with respect to, "Good Old Music". And –
> A. No – I'm sorry.
> Q. And my question to you, sir, is based upon your prior testimony, I thought that you understood that Groovesville Music had music publishing rights in this music composition as of 1967?
> A. Yes. I didn't – that's not my – I didn't sign that. I'm not going to say it's not my signature but I didn't sign that.

6

(Id. at 86)

> Q.  And if we look at the opening paragraph before paragraph 1, this is an
> agreement between Bridgeport Music and you, dated August 31st, 1971.
> . . . .
> Q. Is that your signature on the second page under Malbiz Music?
> . . . .
> A. . . . It looks like my signature but I can't be sure that any of these
> documents is my – that I signed it.  I don't believe it's the same documents.

(Id. at 88)

> Q.  And we don't need to read through every page of this but does this appear
> to be an August 30, 1972, agreement between you and Westbound Records?
> A.  Yes.
> Q.  Now turning to the last page of this document to the right, does that appear
> to be your signature, sir?
> A.  Again, it appears to be my signature but I don't think I signed this contract
> and I think I said that already. . . . No. I didn't sign this one – this paper here.

(Id. at 91-92)

> Q. Okay. Let's turn to the last page of that document, which is WR00019. And
> is that your signature on that page?
> A. I don't think so.  I don't think so.

(Id. at 93)

> Q. . . . [I]s this a songwriter's agreement for, "Can You Get To That"?
> A.  Does it have a signature on it? Well, I didn't sign it.
> Q.  We'll turn to the second page. Is that your signature?
> A. Yes, that looks like my signature but I didn't sign that. . . . That song was
> already out.
> Q.  When you say it was already out, was that one of the songs that was
> released by Revilot?
> A. Yes.
> Q.  Okay. And was it your understanding that song was already subject to a
> music publishing agreement?
> A.  That was my understanding.

(Id. at 98-99)

   Plaintiffs registered the six Compositions with the Copyright Office between the

1970s and early 1990s:

- "Baby I Owe You Something Good" (a/k/a "The Victor") United States Copyright Registration number PA0000557896 dated November 4, 1991 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 39; Boladian Decl., Ex. 14 (Dkt. No. 100-3) at 38);

- "Good Old Music," United States Copyright Registration number EU232643 dated February 16, 1971, and renewed on September 30, 2003 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 45; Boladian Decl., Ex. 17 (Dkt. No. 100-3) at 47);

- "Good Old Music," United States Copyright Registration number PA00000627685 dated August 8, 1992 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 46; Boladian Decl., Ex. 16 (Dkt. No. 100-3) at 44);

- "Let's Make it Last," United States Copyright Registration number EU438646 dated October 17, 1973, and renewed on January 2, 2001 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 52; Boladian Decl., Ex. 20 (Dkt. No. 100-3) at 55);

- "Let's Make it Last," United States Copyright Registration number PA0001050781 dated June 12, 1998 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 53; Boladian Decl., Ex. 21 (Dkt. No. 100-3) at 58);

- "I'll Stay" (a/k/a "I'll Wait"), United States Copyright Registration number EU891961 dated October 9, 1974, and renewed on September 30, 2003 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 59; Boladian Decl., Ex. 24 (Dkt. No. 100-4) at 4);

- "I'll Stay" (a/k/a "I'll Wait"), United States Copyright Registration number PA0000548294 dated December 13, 1991 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 60; Boladian Decl., Ex. 23 (Dkt. No. 100-4) at 1);

- "Can You Get to That" (a/k/a "What You Been Growing"), United States Copyright Registration number EU274894 dated September 8, 1971, and renewed on January 4, 1999 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 67; Boladian Decl., Exs. 26-27 (Dkt. No. 100-4) at 9-16);

- "Can You Get to That" (a/k/a "What You Been Growing"), United States Copyright Registration PA0001053067 dated June 12, 1998 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 68; Boladian Decl., Ex. 28 (Dkt. No. 100-4) at 18);

- "The Goose" (a/k/a "The Goose (That Laid the Golden Egg)," United States Copyright Registration number PA0000612427 dated November 2, 1991 (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 73; Boladian Decl., Ex. 30 (Dkt. No. 100-4) at 23).[5]

---

[5] Plaintiffs also claim that Clinton and a co-writer registered "The Goose" on June 30, 1975, and that Plaintiffs renewed that copyright on September 30, 2003. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 72-73) However, the cited document is not clearly a copyright registration, and to the extent

Bridgeport Music also registered the Compositions with Broadcast Music, Inc.

("BMI") – an organization that sells blanket licenses for millions of musical compositions – in

the 1970s, and has been receiving royalties for the Compositions since that time.  (Pltf. R. 56.1

Stmt. (Dkt. No. 100) ¶¶ 41, 47-48, 55, 63, 69, 73, 76, 78)  Defendants do not dispute the

information contained in these registrations, but dispute their validity, citing the prior copyright

registrations obtained by entities affiliated with Taylor as well as Clinton's testimony that he did

not sign certain of the Bridgeport/Westbound Agreements.  (Def. R. 56.1 Counterstmt. (Dkt. No.

105) ¶¶ 36-74)  Defendants do not dispute that Taylor did not receive any royalties from BMI in

connection with the Compositions.  (Id. ¶¶ 48, 78, 84)  Taylor was aware of Westbound Records'

sound recordings of the Compositions because he played them on the radio while working as a

disc jockey in Detroit.  (Id. ¶ 20; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 20)

When Taylor died in 2000, he was survived by Oliver, his widow, and his four

children.  (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 100)  Taylor disposed of his estate by way

of a will that does not mention the Compositions or the record companies he owned, and directs

that his residuary estate be distributed to his four children.  (Pltf. R.56.1 Stmt. (Dkt. No. 100)

¶¶ 101-02; Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 101-02; see also Parness Decl., Ex. F,

Taylor Will (Dkt. No. 104-6))

In 2011, Oliver contacted Aaron Fuchs, the owner of Plaintiff TufAmerica, to

discuss selling the estate's rights in the Compositions to TufAmerica.  (Def. R. 56.1 Stmt. (Dkt.

No. 105) ¶ 103)  Although Oliver possessed tape recordings of the Compositions, she did not

have documents demonstrating her rights in the Compositions.  (See id. ¶¶ 104, 110, 113)  Oliver

---

that it is, the work listed is the Funkadelic album "Standing on the Verge of Getting It On."
(Busch Decl., Ex. 12 (Dkt. No. 100-1) at 110)  The document lists songs included on the album,
but "The Goose" is not among them.  (Id.)

also did not research her claims to the Compositions.  (Id. ¶ 105)  When Fuchs asked Oliver if

she "had any paperwork that went along" with the tapes, she said that she did not.  (Id. ¶¶ 106-

07) TufAmerica did not search for copyright registrations for the Compositions before

purchasing Oliver's rights in the Compositions. (Id. ¶ 109)

       In an August 9, 2011 agreement (the "TufAmerica Agreement"), and in exchange

for $6,500, Oliver sold to TufAmerica

> Fifty Percent (50%) of the ownership interest and all worldwide copyright,
> renewals and/or other rights in and to all musical compositions, sound recordings,
> and audiovisual records solely owned or controlled by [Oliver, Taylor's estate,
> and all companies owned or controlled by LeBaron Taylor's Estate, including
> Revilot Records, Red Cap Records, Solid Hit Records, Solid Hitbound
> Productions, LeBaron Music, Groovesville Music, and Brute Records] including
> but not limited to those listed in Schedules "A" and "B" . . . attached [to the
> TufAmerica Agreement]

(Parness Decl., Ex. D (Dkt. No. 104-4) at 2; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 111)

       On August 15, 2011, after executing the TufAmerica Agreement, Oliver told her

attorney that she objected to the inclusion of the following language in the "Representations and

Warranties" section of the agreement:  "[Oliver] warrants and represents that she has valid

signed agreements with each and every artist, producer and songwriter and any other copyright

holder and/or rights owner associated with these copyrights and that those agreements transfer all

right, title, and interest to [Oliver]. . . ."  (Busch Decl., Ex. 11 (Dkt. No. 100-1) at 105; Pltf. R.

56.1 Stmt. (Dkt. No. 100) ¶ 113)  Oliver felt "uncomfortable" making these representations

because she had "no written documents [with respect to the Compositions], just the tapes."

(Busch Decl., Ex. 11 (Dkt. No. 100-1) at 105; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 113)  Her

attorney then instructed TufAmerica to remove that language from the TufAmerica Agreement.

(Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 114)

In a December 11, 2017 letter to Plaintiffs – issued more than six years after signing the TufAmerica Agreement – TufAmerica claimed to own the Compositions and accused the Plaintiffs of infringing TufAmerica's rights in the Compositions.  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 116; Busch Decl., Ex. 16 (Dkt. No. 100-1) at 137)  Plaintiffs filed the instant case after further exchanges between Plaintiffs and TufAmerica failed to resolve the parties' dispute concerning ownership of the Compositions.  (See Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 117-23)  On December 9, 2019, after this action was filed, TufAmerica purchased Oliver's remaining 50% interest in the Compositions for an additional $6,000.  (Id. ¶ 125; Parness Decl., Ex. E (Dkt. No. 104-5))

## II.    PROCEDURAL HISTORY

The Complaint was filed on January 11, 2018, in the Eastern District of Michigan and seeks a declaratory judgment that (1) Plaintiffs have not infringed upon any copyrights allegedly owned and/or controlled by Defendants by re-recording, commercially releasing, and/or otherwise exploiting the Compositions; (2) Plaintiffs are the rightful owners of the Compositions; and (3) Defendants do not have an interest in the copyrights to the Compositions. (Cmplt. (Dkt. No. 1))  On February 20, 2019, Defendants' motion to transfer venue was granted and the case was transferred to this District.  (Dkt. No. 21)  Defendants answered the Complaint on April 11, 2021, and on May 8, 2019, Defendants filed an amended answer asserting counterclaims for copyright infringement, an accounting, and a declaratory judgment that Defendants own the Compositions.  (Dkt. Nos. 28, 32)  Plaintiffs filed an answer to Defendants' counterclaims on May 29, 2019.  (Dkt. No. 33)  Plaintiffs moved for summary judgment on January 18, 2021.  (Pltf. Mot. (Dkt. No. 98))

11

## DISCUSSION

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162 (RWS), 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II.   COPYRIGHT OWNERSHIP

Plaintiffs contend that they are entitled to summary judgment on their request for a declaration that they own the Compositions.  As should be clear from the Court's factual recitation, however, there are material issues of fact that preclude resolving ownership as a matter of law.

### A.   Applicable Law

"For disputes as to ownership of copyright, a court applies the 1909 Act to works created and actions taken before 1978 (the effective date of the 1976 Act) and the 1976 Act to works created and actions taken after 1978." Stern v. Lavender, 319 F. Supp. 3d 650, 667 (S.D.N.Y. 2018)

Under the 1909 Act, the author of a work holds "state common law copyright [] protection until first publication, and thereafter the work [is] entitled to an initial 28-year term of statutory copyright, provided that adequate statutory notice was given at publication, or appropriate registration and deposit were made." Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc., 380 F.3d 624, 632-33 (2d Cir. 2004) (citing 17 U.S.C. §§ 2, 10, 12, 19, 21, 24 (repealed))  The 1909 Act provides that a copyright may be "assigned, granted, or mortgaged by an instrument in writing signed by the proprietor of the copyright." 17 U.S.C. § 28 (repealed).  "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c); Gaste v. Kaiserman, 863 F.2d 1061, 1064 (2d Cir. 1988) ("[W]e follow the majority rule and hold that under section 209 of the 1909 Act, a

13

valid certificate of registration creates a rebuttable presumption of compliance with the requirements for validity.").

    **B.**   **Analysis**

        Plaintiffs allege that they filed copyright registrations in the Compositions in the following years: (1) 1991 for "The Victor" (also known as "Baby I Owe You Something Good"); (2) 1971 for "Good Old Music" (3) 1973 for "Let's Make it Last"; (4) 1974 for "I'll Stay" (also known as "I'll Wait"); (5) 1971 for "Can You Get to That" (also known as "What You Been Growing"); and (6) 1991 for "The Goose." (Boladian Decl., Exs. 14, 17, 20, 24, 26, 30 (Dkt. Nos. 100-3, 100-4)) In addition to these original copyright registrations, Plaintiffs have submitted subsequent copyright registrations and renewal registrations, BMI registrations, and the agreements in which Plaintiffs allege that Clinton transferred ownership in the Compositions to Plaintiffs.

        Defendants assert that they obtained copyright registrations for the Compositions in 1967 or 1968. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133; Parness Decl., Exs. I, K, M, O, Q (Dkt. Nos. 104-9, 104-11, 104-13, 104-15, 104-17))

        Neither side has offered reliable evidence as to the date of first publication of the Compositions, however. Indeed, neither side has addressed when the Compositions were first published, and their submissions contain scant evidence on this point.

        In moving for summary judgment, Plaintiffs take no position on the Compositions' date of first publication. It is undisputed, however, that all of the Compositions other than "The Goose" – which was published by non-party Casablanca – were released by Westbound Records on various Funkadelic albums between 1970 and 1975. (Def R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 36, 42, 49, 56, 64)) As to "The Goose," Plaintiffs have not

submitted any admissible evidence as to when it was first published.  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 70 (citing the Complaint))  Given that Plaintiffs have submitted original copyright registrations filed as late as 1991, it is clear that certain of Plaintiffs' copyright registrations are not entitled to a presumption of validity, because they fall far outside the Copyright Act's five-year window.  Gaste, 863 F.2d at 1064.

And while Defendants assert that the Compositions were first published in 1967 or 1968, and have submitted six images of vinyl record labels for the Compositions, none of these images show the year of the Composition's release.  (Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-10, 104-12, 104-14, 104-16))  If Defendants are correct that the Compositions were first published in 1967 or 1968, their registrations would be entitled to a presumption of validity.  But Defendants have not submitted reliable evidence concerning the date of first publication.

In any event, because Plaintiffs have not offered evidence sufficient to demonstrate that their copyright registrations were filed before or within five years of the Compositions' publication dates, the "statutory presumption of ownership does not attach to [Plaintiffs'] registration[s.]"  See Stern, 319 F. Supp. 3d at 670.

Even if Plaintiffs' copyright registrations were entitled to a presumption of validity, Plaintiffs would not be entitled to summary judgment, because Defendants have offered evidence that creates material issues of fact as to ownership of the Compositions.  See SAS Inst., Inc. v. World Programming Ltd., 64 F.4th 1319, 1329 (Fed. Cir. 2023) ("[T]he district court [correctly] found that WPL provided ample evidence to rebut SAS's prima facie evidence of duly issued copyright registrations.").

Defendants have offered evidence that Taylor had an interest in certain of the Compositions at the time of his death.  This evidence includes (1) Clinton's testimony that he signed an agreement with Taylor's company, Revilot Records in approximately 1965 (Clinton Dep. (Dkt. No. 104-3) at 47-65); (2) copyright registrations for certain of the Compositions held by LeBaron Taylor or other entities that predate Plaintiffs' copyright registrations (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 133); and (3) images of vinyl record labels bearing the names of the Compositions which were apparently released by LeBaron Taylor and his affiliated companies.  (Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-10, 104-12, 104-14, 104-16))  And, as discussed above, Clinton repeatedly testified that he had not signed certain Bridgeport/Westbound Agreements that purportedly bear his signature.  (Clinton Dep. (Dkt. No. 104-3) at 86, 88, 91-93, 98-99)

While (1) Plaintiffs acknowledge that "Clinton recorded for Revilot Records in the 1960s before the label went bankrupt" (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 17), and (2) Defendants have submitted copyright registrations for five of the six Compositions that list LeBaron Taylor or associated entities as copyright claimants, Plaintiffs dispute the validity and effect of Defendants' copyright registrations, given Plaintiffs' own copyright registrations.  (Pltf. Resp. to Def. R. 56.1 Counterstmt. (Dkt. No. 102) ¶ 133)  However, Plaintiffs have not cited any case in which a court has granted a copyright claimant summary judgment in the face of competing, seemingly valid, and earlier copyright registrations regarding the same works.

Plaintiffs argue, however, that they "have [presented] a clear, direct, and documented chain of title for the Compositions . . . [while] Defendants . . . have produced no written agreements or documentation supporting any claim to the [] Compositions."  (Pltf. Br. (Dkt. No. 99) at 15)  As discussed above, however, because of Plaintiffs' failure to demonstrate

16

the date of first publication, Plaintiffs' copyright registrations have no presumption of validity.

And while (1) Plaintiffs contend that a written agreement assigning rights in the Compositions to

Taylor "is a requirement for Defendants' actions to have a shot at succeeding" (Pltf. Reply (Dkt.

No. 101) at 3-7); and (2) the 1909 Act provides that a copyright can be "assigned, granted, or

mortgaged by an instrument in writing signed by the proprietor of the copyright," 17 U.S.C. § 28

(repealed), Plaintiffs have cited no case law suggesting that Defendants are required to submit a

copy of such an agreement in order to defeat Plaintiffs' summary judgment motion.[6]  To the

contrary, it is Plaintiffs and not Defendants who bear the burden of proof here, and this Court is

required to consider the evidence in the light most favorable to Defendants, as the non-movants.

See Spinelli, 579 F.3d at 166 ("[At summary judgment, the Court] 'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'") (quoting Brown, 257 F.3d at 251).

          The evidence proffered by Defendants is sufficient to create a material issue of

fact as to whether Plaintiffs hold valid copyrights in the Compositions.  As discussed above,

Defendants have proffered copyright registrations that predate Plaintiffs' copyright registrations,

and show title passing from Clinton to Taylor or Taylor-affiliated entities.  (See Parness Decl.,

Exs. I, K, M, O, Q (Dkt. Nos. 104-9, 104-11, 104-13, 104-15, 104-17) (indicating Clinton and

others authored the Compositions and listing entities affiliated with LeBaron Taylor as

---

[6]  Jim Henson Productions, Inc. v. John T. Brady Assocs., Inc., cited by Plaintiffs (Pltf. Reply
(Dkt. No. 101) at 7-8), is not to the contrary. 16 F. Supp. 2d 259, 285 (S.D.N.Y. 1997).  In that
case, plaintiffs – the authors of the disputed works – possessed copyright registrations that
defendants sought to challenge, citing an agreement purporting to assign rights in the works to
the defendants.  Id.  Because of ambiguities in the alleged assignment agreement, the court held
that it did not assign copyright in the disputed works to defendants.  Id. at 286-89.  In sum, Jim
Henson Productions does not hold that a party cannot assert copyright ownership absent
evidence of an agreement transferring ownership of the relevant copyright to that party.

claimants)) The "facts stated [in Defendants' copyright registrations], including the chain of title

. . . [are] entitled to the presumption of truth."  See United Fabrics Int'l, Inc. v. C&J Wear, Inc.,

630 F.3d 1255, 1258 (9th Cir. 2011).

And while Plaintiffs assert that they "have [presented] a clear, direct, and

documented chain of title for the Compositions" (Pltf. Br. (Dkt. No. 99) at 15), they largely

ignore Clinton's testimony that he did not sign many of the Bridgeport/Westbound Agreements.

As Plaintiffs repeatedly point out, a copyright can only be "assigned, granted, or mortgaged by

an instrument in writing signed by the proprietor of the copyright." 17 U.S.C. § 28 (repealed).

Accordingly, Clinton's testimony that he did not sign many of the agreements on which

Plaintiffs rely creates a material issue of fact as to Plaintiffs' claim of ownership.[7]

Plaintiffs argue, however, that Clinton's deposition testimony as to the Revilot

Agreement is "confusing and contradictory," and suggests that any agreement was between

Clinton and Groovesville, and not with Taylor.  (Pltf. Reply (Dkt. No. 101) at 4-5)  As discussed

above, Clinton testified that he had an agreement with Revilot in about 1965.  (Clinton Dep.

(Dkt. No. 104-3) at 47-48)  Beyond this basic fact, Clinton's testimony regarding Revilot,

Groovesville, and Taylor is confusing.  Clinton variously testified that the Revilot Agreement

had a "publishing component" with Groovesville; that he "didn't have a publishing agreement

---

[7] Plaintiffs contend that Clinton's testimony is irrelevant, because in a lawsuit between Clinton and Boladian "the United States District Court for the Northern District of Florida ruled that Mr. Clinton did assign certain musical compositions [written by him as of March 4, 1982], including those at issue here, . . . to Bridgeport." (Pltf. Reply (Dkt. No. 101) at 3-9)  But there is no evidence that Defendants were a party to any prior lawsuit between Boladian and Clinton, and Plaintiffs have not argued, much less demonstrated, that non-party preclusion is appropriate here. See Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc., 571 F.3d 299, 312 (3d Cir. 2009). Generally, "'[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.'" Id. (quoting Richards v. Jefferson Cnty., Ala., 517 U.S. 793, 798 (1996)).

. . . [but only] a songwriter's agreement"; and that "Groovesville was that publisher . . . [and that

he] didn't know anything about LeBaron Music or any other name." (Id. at 48-49, 57-58, 65

("[Clinton] understood that songs that were released by Revilot were subject to at least a

publishing agreement.")) Clinton also testified that Groovesville may or may not have been co-

owned by Taylor and another person named Don Davis. (Id. at 111 ("Q. As far as Groovesville

is concerned, is it correct that was a Don Davis owned company? A. My understanding [is that

Taylor and Davis] were partners in the beginning and somewhere along the line they separated

and it ended up being Don Davis.") While Plaintiffs suggest that Clinton's use of the term

"publishing agreement" demonstrates that any copyright assignments were made to Groovesville

and not Revilot (Pltf. Reply (Dkt. No. 101) at 5-6), Clinton did not testify as to the significance

and terms of a "publishing agreement" as opposed to a "songwriter's agreement."

        In sum, in testifying about events that took place sixty years ago, Clinton did not

recall (1) the terms of the Revilot Agreement; (2) the nature of the relationship between Revilot

and Groovesville; or (3) their arrangements with respect to copyright ownership in the

Compositions. Clinton's testimony merely highlights the lack of clarity in the evidence

regarding ownership of the Compositions.

        Plaintiffs further contend that their "course of dealing" with respect to the

Compositions, including registering them with BMI and collecting royalties – actions that Taylor

never challenged – outweighs the evidence of Defendants' copyright registrations. (Pltf. Br.

(Dkt. No. 99) at 18-20) However, it is not this Court's role at summary judgment to weigh the

evidence. Roberts v. Genting New York LLC, 68 F.4th 81, 88 (2d Cir. 2023) ("[Courts] do 'not

weigh evidence or assess the credibility of witnesses at the summary judgment stage.'") (quoting

Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005).

Plaintiffs argue, however, that Stern v. Lavender indicates that their course of dealing argument should be given weight.  Plaintiffs' reliance on Stern is misplaced.

In Stern, plaintiffs claimed that defendant had infringed on plaintiffs' copyright in certain photographs.  Stern, 319 F. Supp. 3d at 658.  The parties cross-moved for summary judgment as to ownership of the photographs, and the court concluded that Plaintiffs' copyright registrations in these photographs established a rebuttable presumption of copyright ownership. Id. at 658, 675.  Defendants argued, however, that the author of the photographs had created them on a work-for-hire basis.  Id. at 667.  Plaintiffs contended that the work-for-hire assertion was "squarely at odds with" the long course of dealing between the author and Condé Nast, his publisher.  See id. at 675.  In particular, the author had granted Condé Nast licenses in his works, a fact that constituted "powerful circumstantial evidence" of copyright ownership by plaintiffs, who were the author's successors.  Id. at 675-76.  The court "held that . . . Stern[, the author and plaintiffs' predecessor in interest,] owned the copyright in the . . . photographs [in question.]"  Id. at 675-76 & n.18.

Here, Plaintiffs have no evidence comparable to the licenses that the author in Stern issued to Condé Nast, a course of dealing between the author and the publisher that directly rebutted the Stern defendant's argument that the author's photographs were work-for-hire. Acknowledging that Plaintiffs have "openly exploited" and collected royalties on the Compositions for decades, Defendants have proffered copyright registrations for the Compositions, have presented sound recordings of the Compositions, and have offered testimony from the author in which he denies conveying the copyrights in the Compositions to Plaintiffs. Defendants' showing is thus much more substantial than that proffered by the Stern defendant,

who offered the weak work-for-hire argument and "a deconstruction of [the photographer's] memoir." See id. at 675.

The Court concludes that Plaintiffs are not entitled to summary judgment on their claim that they own the Compositions.

## III.   WHETHER THE PARTIES' CLAIMS AND COUNTERCLAIMS ARE TIME-BARRED

Plaintiffs contend that they are entitled to summary judgment on Defendants' counterclaims, because the counterclaims are time-barred under the Copyright Act's statute of limitations.  (Pltf. Br. (Dkt. No. 99) at 23-24)  Defendants contend that Plaintiffs' motion for summary judgment on Plaintiffs' claims should be denied, because Plaintiffs' claims are time-barred under the Copyright Act.  (Def. Opp. (Dkt. No. 103) at 21-22)  For the reasons stated below, this Court concludes that Defendants' counterclaims are time-barred but that Plaintiffs' claims are not.

### A.   Applicable Law

The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  The Copyright Act's statute of limitations "is an affirmative defense" for which the party asserting it bears "the burden of proof."  United States v. Livecchi, 711 F.3d 345 (2d Cir. 2013).

To establish an action for infringement, "two elements must be proven:  (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc., 499 U.S. 340 (1991).  Where ownership is not disputed and an infringement claim turns solely on copying, "an infringement is actionable within three years, and only three years, of its occurrence."  Petrella v.

21

Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 671 (2014).  Where "'copyright ownership is not

conceded,'" however, "'ownership, and not infringement, is the gravamen of the plaintiff's claim

to which the statute of limitations is applied.'"  Kwan v. Schlein, 634 F.3d 224, 226 (2d Cir.

2011) (quoting Ortiz v. Guitian Bros. Music Inc., 2008 WL 4449314, at *3 (S.D.N.Y. Sept. 29,

2008)).  Accordingly, "a time-barred ownership claim will bar a claim for copyright

infringement where . . . the infringement claim cannot be decided without adjudication of a

genuine dispute as to the plaintiff's ownership of the copyright."  Id.; Merchant v. Levy, 92 F.3d

51, 56 (2d Cir. 1996) ("[Plaintiffs are] time-barred three years after accrual of their claim from

seeking a declaration of copyright co-ownership rights and any remedies that would flow from

such a declaration.").

        "An ownership claim accrues only once, when 'a reasonably diligent plaintiff

would have been put on inquiry as to the existence of a right.'"  Kwan, 634 F.3d at 228 (quoting

Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992)).  "[A]t least three types of events [] can

put a potential plaintiff on notice and thereby trigger the accrual of an ownership claim:  public

repudiation; private repudiation in communications between the parties; and implicit repudiation

'by conspicuously exploiting the copyright without paying royalties.'"  Wilson v. Dynatone

Publ'g Co., 892 F.3d 112, 118 (2d Cir. 2018) (quoting Gary Friedrich Enterprises, LLC v.

Marvel Characters, Inc., 716 F.3d 302, 317 (2d Cir. 2013)); Horror Inc. v. Miller, 15 F.4th 232,

257 (2d Cir. 2021) (noting that the "accrual rule is slightly different for authorship claims" as

opposed to ownership claims, such that an author "'does not need to bring suit until there has

been an express repudiation of that claim'") (quoting Gary Friedrich Enterprises, 716 F.3d at

317).

22

**B.** **Whether Plaintiffs' Claims are Time-Barred**

Plaintiffs filed the instant case in January 2018, a month after Defendants sent Plaintiffs a letter claiming ownership of the copyrights in the Compositions. (See Busch Decl., Ex. 16 (Dkt. No. 100-1) at 137 (Defendants' December 11, 2017 letter); Cmplt. (Dkt. No. 1)) Defendants have not offered evidence that Plaintiffs were earlier "put on inquiry [notice] as to the existence of a right" or that Defendants' predecessors in interest (1) publicly repudiated Plaintiffs' alleged ownership of the copyrights; (2) privately repudiated Plaintiffs' claimed ownership; or (3) implicitly repudiated Plaintiffs' ownership claim by "by conspicuously exploiting the copyright without paying royalties." Gary Friedrich Enterprises, 716 F.3d at 317.

In support of their argument that Plaintiffs' claims are time-barred, Defendants point to Clinton's deposition testimony "that Mr. Boladian knew that the rights had already been conveyed to Mr. Taylor, both because Mr. Boladian was Mr. Taylor's distributor, and because Mr. Clinton told him that he had conveyed the rights." (Def. Opp. (Dkt. No. 103) at 21 (emphasis omitted)) Clinton's testimony on this point is as follows:

> Q. Did you ever tell Armen Boladian that "I'll Wait," "I'll Stay" was published by Groovesville?
>
> A. He already knew that, he was the distributor.
>
> Q. Did you ever tell him?
>
> A. Yes.
>
> Q. Okay. Did you ever tell Mr. Boladian that "(I Owe You) Something" was published by Groovesville?
>
> A. He knew that.
>
> Q. Did you ever tell him?
>
> A. Yes.

Q.  Did you ever tell Mr. Boladian that "Let's Make It Last" was published by Groovesville?

A.  Again, he already knew, but, yes.

Q.  Did you ever tell Mr. Boladian that "The Goose" was published by Groovesville?

A.  Yes. Yes.
. . . .
Q.  Did you ever communicate with Armen Boladian directly concerning any of these compositions?

A.  "Good Old Music," he knew that. He was the distributor of the record. He already knew that. He was the distributor of Revilot's record.

Q.  Did you ever tell Mr. Boladian that "What You Been Growing" was published by Groovesville?

A.  Yes. He was the distributor, he would have known, period.

Q.  Did you ever tell Mr. Boladian that "Good Old Music" was published by Groovesville?

A.  Yes.

(Clinton Dep. (Dkt. No. 104-3) at 81-82, 145)

Courts treat the Copyright Act's statute of limitations as "something like adverse possession [for] copyright ownership." Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir. 1996) (noting that "[a]n express or implicit ouster of a cotenant by an unequivocal act of ownership starts the adverse possession statute of limitations running"); Gary Friedrich Enterprises, 716 F.3d at 319 (citing Zuill for the same proposition). "Copyright, like real estate, lasts a long time, so stability of title has great economic importance," and "'Congress' paramount goal in revising the 1976 Act [was] enhancing [the] predictability and certainty of copyright ownership.'" Zuill,

80 F.3d at 1370 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 749

(1989)).

Clinton's testimony indicates that he told Boladian – at some unspecified point in

the past – that Groovesville and Revilot had published sound recordings of the Compositions.

(See Clinton Dep. (Dkt. No. 104-3) at 81-82, 145)  But Clinton's testimony does not suggest that

Groovesville or Revilot were exploiting the Compositions during the time period for which

Plaintiffs have claimed title.  Indeed, it is undisputed that since the early 1970s, Plaintiffs alone

have exploited the Compositions by publishing them and collecting royalties based on their use

and performance.  (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶¶ 48, 78, 84)  Clinton's testimony

does not suggest that he told Boladian that Taylor or entities affiliated with Taylor were actively

claiming ownership of the Compositions during a time period in which Plaintiffs were claiming

ownership.  See Everly v. Everly, 958 F.3d 442, 451 (6th Cir. 2020) ("An ownership claim

therefore must be brought within three years after the purported owner's status as such is

challenged by a party with a competing claim of ownership.")  In sum, Clinton's testimony that

he had told Boladian that Groovesville and Revilot had published the Compositions does not

suggest that Taylor or any entity affiliated with Taylor had "ousted" Plaintiffs from ownership,

made a claim of ownership adverse to Plaintiffs, or engaged in any other "unequivocal act of

ownership."  See Zuill, 80 F.3d at 1370.

Citing Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc., 232 F. Supp. 3d

384, 389 (S.D.N.Y. 2017), Defendants argue that Plaintiffs were "on notice of the first rounds of

copyright registrations and released sound recordings of the Compositions, all of which predate

[Plaintiffs'] registrations and contracts."  (Def. Opp. (Dkt. No. 103) at 20)  The Second Circuit

has rejected the notion that a copyright registration alone can put a putative owner on notice of

an adverse claim of ownership, however.  See Wilson, 892 F.3d at 119 ("If mere registration of a

copyright without more sufficed to trigger the accrual of an ownership claim, then rightful

owners would be forced to maintain constant vigil over new registrations.  Such a requirement

would be vastly more burdensome than the obligations that 'a reasonably diligent plaintiff'

would undertake.") (quoting Kwan, 634 F.3d at 228); Wilson v. Dynatone Publ'g Co., 908 F.3d

843, 844 (2d Cir. 2018) (denying rehearing and rejecting the argument "that registration, without

more, triggers accrual of an ownership claim").  In sum, Taylor's registration of copyrights in the

Compositions is not sufficient to trigger accrual of Plaintiffs' rights in the Compositions.[8]

The Court concludes that Plaintiffs' claims are not time-barred under the

Copyright Act's three-year statute of limitations.  17 U.S.C. § 507(b).

---

[8]  In a throw-away assertion, Defendants argue that the "sound recordings" of the Compositions
released by Taylor – like Taylor's copyright registrations – should have put Plaintiffs "on notice"
of Taylor's competing ownership claim in the Compositions such that Plaintiffs' claims are time
barred.  (Def. Opp. (Dkt. No. 103) at 20 ("Plaintiffs should have been on notice of the first
rounds of copyright registrations [by Taylor] and released sound recordings of the
Compositions."))  In support of this argument, Defendants cite Latin Am. Music Co., 232 F.
Supp. 3d 384, which, as discussed above, only discusses the significance of copyright
registrations to notice and accrual of an ownership claim.  (Id. at 20-21).  Latin Am. Music Co.,
232 F. Supp. 3d 389 ("A copyright registration certificate 'put[s] the world on constructive
notice' of the facts stated in the certificate, including ownership of the copyright.") (quoting
Complex Sys., Inc. v. ABN Ambro Bank N.V., 979 F. Supp. 2d 456, 472 (S.D.N.Y. 2013)).
Moreover, Defendants have not offered evidence that Revilot's sound recordings were being
marketed and promoted after Plaintiffs registered their copyrights or otherwise made a claim of
ownership with respect to the Compositions.

Defendants' "argument that [P]laintiff[s'] copyright infringement claims must be dismissed on
statute of limitations grounds 'is an affirmative defense for which [Defendants] bear[] the burden
of proof.'"  Parisienne v. Scripps Media, Inc., 2021 WL 3668084, at *2 (S.D.N.Y. Aug. 17,
2021) (quoting Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC, 23 F. Supp. 3d 344, 358
(S.D.N.Y. 2014)).  Defendants have not carried their burden to show that Taylor's release of
sound recordings of the Compositions before Revilot's bankruptcy – alone or in combination
with the prior copyright registrations – triggered accrual of Plaintiffs' ownership claims for
purposes of the Copyright Act's statute of limitations.

C.     **Whether Defendants' Counterclaims are Time-Barred**

Plaintiffs have moved for summary judgment on Defendants' counterclaims, which (1) seek a declaratory judgment that TufAmerica "is the rightful owner of the copyrights in the Compositions"; (2) allege copyright infringement; and (3) seek an accounting in connection with Plaintiffs' commercial exploitation of the Compositions.  (Pltf. Br. (Dkt. No. 99) at 4; Am. Ansr. & Counterclaims (Dkt. No. 32) ¶¶ 53-69)

Plaintiffs argue that Defendants' counterclaims are barred by the statute of limitations.  (Pltf. Br. (Dkt. No. 99) at 23)  Because "copyright ownership is not conceded" in this case, "ownership, and not infringement, is the gravamen" of Defendants' counterclaims. Kwan, 634 F.3d at 230.  Accordingly, if Defendants' ownership claim is time-barred, their "attendant infringement claims must fail."  Id.  The Court concludes that Defendants' counterclaims accrued either in the 1970s, when Plaintiffs implicitly repudiated Defendants' ownership of the Compositions, or at the latest in 2011 when Defendants purchased Oliver's rights in the Compositions.

For more than thirty years before Taylor's death, Plaintiffs received royalties based on their exclusive registration of the Compositions with BMI.  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 78, 84)  While "an ownership claim is triggered by knowledge of an entitlement to royalties that are not being paid, rather than by mere knowledge of the exploitation [by another,] . . . learning that another [person or entity] . . . is exploiting the work is sufficient notice that royalties are due."  Gary Friedrich Enterprises, LLC, 716 F.3d at 319.

Here, Taylor had obtained copyright registrations for the Compositions and made and released sound recordings of the Compositions prior to Revilot's bankruptcy.  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 17-18; Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-

27

10, 104-12, 104-14, 104-16))  After Revilot's bankruptcy, Clinton and Funkadelic re-recorded

the Compositions, and Westbound Records released the new recordings on various albums

during the 1970s.[9]  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 36, 42, 49, 56, 64)  It is undisputed that,

after the Revilot bankruptcy, Taylor worked as a disc jockey in Detroit, and played Westbound's

sound recordings of the Compositions on the radio.  (Def. R. 56.1 Counterstmt. (Dkt. No. 105)

¶ 20)  Accordingly, Taylor was aware that the Compositions were being exploited by another

record company.  There is no evidence that Taylor ever received royalties in connection with his

copyright registrations in the approximately thirty years between Plaintiffs and Casablanca

Records' exploitation of the Compositions and Taylor's death.[10]  Despite knowing that the

Compositions were being publicly exploited, there is no evidence that Taylor ever asserted his

ownership rights.

   "Considering the depth of [Taylor's] experience in the music industry," when

Clinton and Funkadelic released sound recordings of the Compositions, Taylor had "reason to

know" that he had been injured by not receiving royalties for performances of the Compositions,

if in fact he believed that he still owned copyrights in the Compositions.  See Mahan v. Roc

Nation, LLC, 2015 WL 1782095, at *4 (S.D.N.Y. Apr. 15, 2015), aff'd, 634 F. App'x 329 (2d

Cir. 2016) ("[T]he absence of any royalties sent to [p]laintiff [] gave him reason to know of his

injury."); see also Howard v. Carter, 615 F. Supp. 3d 190, 195 (W.D.N.Y. 2022), appeal

dismissed, 2022 WL 18283303 (2d Cir. Nov. 17, 2022) ("Howard should have known he was not

receiving the royalties that he supposedly was entitled to when [the work in question was

---

[9]  As noted above, "The Goose" was recorded and released by non-party Casablanca Records in 1974.  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 70)

[10]  Indeed, the evidence shows that Bridgeport Music has been receiving royalties for the Compositions since the 1970s.  (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 41, 48, 55, 63, 69, 73, 76, 78)

published and the defendant] 'conspicuously exploit[ed] the copyright[s] without paying

royalties.' . . . [His] copyright ownership claim is, therefore, time-barred.") (quoting <u>Gary

Friedrich Enterprises, LLC</u>, 716 F.3d at 317).   Accordingly, any claim of copyright ownership by

Taylor or a Taylor-affiliated entity would be time-barred.

 Here, Defendants assert that they are Taylor's successors in interest.[11]   (Def. Opp.

(Dkt. No. 103) at 4)   Accepting Defendants' assertion, their counterclaims alleging ownership

and infringement of the Compositions are time-barred.   <u>See</u> <u>Seven Arts Filmed Ent. Ltd. v.

Content Media Corp. PLC</u>, 733 F.3d 1251, 1257 (9th Cir. 2013) (repudiation of a predecessor in

interest's claim of ownership more than three years prior barred successor's claim for copyright

infringement); <u>TMTV Corp. v. Pegasus Broad. of San Juan</u>, 490 F. Supp. 2d 228, 232 (D.P.R.

2007) (infringement claim time-barred based on predecessor-in-interest's knowledge of earlier

infringements).

 Even if Defendants were not bound by Taylor's knowledge that the Compositions

were being exploited by another record company, their claims accrued – at the latest – in 2011,

when TufAmerica purchased rights in the Compositions from Oliver.   As a result of their

dealings with Oliver, Defendants were on "inquiry as to the existence of a right" at that time.

<u>Kwan</u>, 634 F.3d at 228.   When TufAmerica purchased half of Oliver's rights in the Compositions

in 2011, she told Aaron Fuchs – TufAmerica's owner – that she did not have "any paperwork"

confirming her ownership interest in the Compositions.   (Def. R. 56.1 Stmt. (Dkt. No. 105)

¶¶ 103-07, 110)   And after signing the agreement with TufAmerica, Oliver was sufficiently

---

[11]   Plaintiffs dispute that Defendants are Taylor's successors in interest.   (Pltf. Br. (Dkt. No. 99)
at 20-22)   Because the Court concludes that Defendants' counterclaims are time-barred, it does
not reach Plaintiffs' argument that Oliver did not effectively transfer any rights in the
Compositions to TufAmerica.

"uncomfortable" that she directed her attorney to ask TufAmerica to remove from the "representations and warranties" section of the TufAmerica Agreement a sentence providing that Oliver "warrants and represents that she has valid signed agreements with each and every artist, producer, and songwriter and any other copyright holder and/or rights owner associated with these copyrights and that those agreements transfer all right, title, and interest to [Oliver]. . . ." (Busch Decl., Ex. 11 (Dkt. No. 100-1) at 105; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 113-14)

Before signing the agreement with Oliver, Fuchs "reviewed the discography and discussed with [Oliver] her rights[,] [and] knew that she was [Taylor's] wife and she was his successor in interest . . . [and] that she had tapes." (Busch Decl., Ex. 1 (Fuchs Dep.) (Dkt. No. 100-1) at 43) At the time, that was "sufficient for [Fuchs] to move forward." (Id.) Despite Oliver's expressed concern that she lacked documents showing Taylor's ownership interest in the Compositions (Busch Decl., Ex. 2 (Oliver Dep.) (Dkt. No. 100-1) at 28), Fuchs did not search the copyright catalog for registrations until a "few years" after purchasing a 50% share of Oliver's interest in the Compositions. (Busch Decl., Ex. 1 (Fuchs Dep.) (Dkt. No. 100-1) at 35-36) Fuchs testified that he may have wanted to conduct such a search before purchasing a 50% share of Oliver's interest, but he lacked the resources to do so. (Id. ("Q. Why did you not [search for copyright registrations] before you purchased the catalog? A. When you run a small label in the record business in New York City, you can't always do what you want to when you want to.") Had Fuchs searched the register of copyrights at that time, he would have discovered multiple copyright registrations for the Compositions. More than six years after the agreement with Oliver was executed, TufAmerica sent a letter to Plaintiffs claiming ownership of the compositions, having conducted a search of the copyright registry. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 116)

As the owner and operator of a record label, Fuchs – like Taylor – had substantial "experience in the music industry." Mahan, 2015 WL 1782095, at *4. For $6,500, he was able to purchase a 50% ownership stake in "all worldwide copyright, renewals, and/or other rights in certain musical works" created by one of the most celebrated funk musicians of all time. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 111) Given Fuchs' knowledge of the music industry, and the price he paid Oliver, the notion that Fuchs was not on inquiry notice that another party might have claimed ownership of the Compositions "strains credulity." Mahan, 2015 WL 1782095, at *4.

Defendants argue, however, that there are material issues of fact concerning the accrual of Defendants' ownership claim in the Compositions, and that these issues of fact preclude granting Plaintiffs summary judgment on Defendants' counterclaims. (See Def. Opp. (Dkt. No. 103) at 20-21) In this regard, Defendants cite only Clinton's testimony that he told Boladian – at an unspecified time – that Groovesville and Revilot had published the Compositions. (Id. (citing Clinton Dep. (Dkt. No. 104-3) at 81-82, 145)) As discussed above, Clinton's alleged statements to Boladian do not constitute a repudiation of Plaintiffs' ownership claims. In any event, Clinton's testimony on this point is irrelevant to whether Taylor's ownership of the Compositions was ever publicly, privately, or implicitly repudiated by Plaintiffs, or whether Defendants were on inquiry notice of a right in 2011.

Because (1) Defendants' ownership claims accrued in 2011 at the latest, and (2) the instant lawsuit was not initiated until 2018, Defendants' counterclaims are time-barred under the Copyright Act's three-year statute of limitations.

Accordingly, Plaintiffs will be granted summary judgment on Defendants' counterclaims.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is granted as to Defendant's counterclaims and is otherwise denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 98).

This case will proceed to trial on **September 5, 2023 at 9:30 a.m.** in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order, motions in limine, voir dire requests, and requests to charge are due on **August 11, 2023**. Responsive papers, if any, are due on **August 18, 2023**. A final pretrial conference will be conducted on **August 31, 2023 at 4:30 p.m**.

Dated: New York, New York
       July 26, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge

32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRIDGEPORT MUSIC, INC. and
WESTBOUND RECORDS, INC.,

      Plaintiffs / Counterclaim-
      Defendants

        - v -

TUFAMERICA, INC. d/b/a TUFF CITY
RECORDS, and KAY LOVELACE
TAYLOR, individually and on behalf of the
Estate of LeBaron Taylor,

      Defendants / Counterclaim-
      Plaintiffs.

**ORDER**

19 Civ. 01764 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

      This is a copyright ownership dispute in which Plaintiffs Bridgeport Music, Inc. and Westbound Records, Inc. seek a declaratory judgment that (1) Plaintiffs are the rightful owners of certain musical compositions authored by George Clinton (the "Compositions"); (2) Defendants do not have any valid ownership claims in the Compositions; and (3) Plaintiffs have not infringed upon any copyrights allegedly owned by Defendants in the Compositions. (Cmplt. (Dkt. No. 1))  Defendants TufAmerica, Inc. and Kay Lovelace Taylor have brought counterclaims for (1) a declaratory judgment that TufAmerica is the rightful owner of the Compositions; (2) copyright infringement; and (3) an accounting regarding the damages caused by Plaintiffs' alleged unauthorized commercial exploitation of the Compositions.  (Am. Ansr. (Dkt. No. 32) ¶¶ 53-69)  A jury trial is scheduled for October 2, 2023. (Dkt. No. 109)

      Plaintiffs moved for summary judgment on their claims and on Defendants' counterclaims.  (Pltf. Sum. J. Br. (Dkt. No. 91))  In a July 26, 2023 Memorandum Opinion and Order (the "Summary Judgment Opinion"), this Court granted Plaintiffs' motion for summary

judgment as to Defendants' counterclaims, finding that the counterclaims are time-barred.  (Sum. J. Opin. (Dkt. No. 106) at 31)[1]  Plaintiffs' motion was otherwise denied.  (Id. at 32)

Defendants have moved for reconsideration pursuant to Local Rule 6.3 (Dkt. Nos. 112-113), while Plaintiffs request that this Court "conditional[ly] dismiss[] Plaintiff's claims in this action under . . . Purdy v. Zeldes, 337 F.3d 253 (2d Cir. 2003), and its progeny."  (Dkt. No. 111)  Defendants join in Plaintiffs' request for a conditional dismissal, in the event that their motion for reconsideration is denied.  (Pltf. Recon. Br. (Dkt. No. 113) at 4 & n.1)

For the reasons stated below, Defendants' motion for reconsideration will be denied, and Plaintiffs' request for conditional dismissal will be granted, subject to the Court's receipt of an appropriate stipulation from the parties.

## BACKGROUND

### I.      FACTS[2]

Plaintiffs are affiliated music companies based in Detroit, Michigan, and distributed soul and funk music in the late 1960s and early 1970s.  Plaintiffs were founded and are owned by Detroit music producer Armen Boladian.  (Sum. J. Opin. (Dkt. No. 106) at 2)

Defendant TufAmerica, Inc. is a record label incorporated in New York.  Dr. Kay Oliver is the widow of LeBaron Taylor.  LeBaron Taylor, who died in 2000, was a music producer, radio disc jockey, and record company executive.  He owned Revilot Records, a Detroit-based record label that went bankrupt in the late 1960s.  (Id.)

---

[1]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.
[2]  The Summary Judgment Opinion sets out the background to the parties' dispute in detail, and the Court assumes familiarity with that decision.

Renowned funk musician George Clinton – a non-party to this lawsuit – is the author or co-author of the Compositions:  (1) "The Victor" a/k/a "Baby I Owe You Something Good"; (2) "Good Old Music"; (3) Let's Make It Last"; (4) "I'll Wait" a/k/a "I'll Stay; (5) "Can You Get To That" a/k/a "What You Been Growing"; and (6) "The Goose (That Laid the Golden Egg)."  (Id.)

The parties agree that Clinton recorded music for Revilot in the late 1960s prior to Revilot's bankruptcy and pursuant to a 1965 agreement between Clinton and Revilot (the "Revilot Agreement").  (Id. at 2-3)  Defendants cite to five copyright registrations dated between 1967 and 1968 as evidence of their ownership of the Compositions.  (Id. at 3-4)

After Revilot entered bankruptcy in the late 1960s, Clinton began recording music for Plaintiff Westbound Records.  The Compositions – except for "The Goose" – were then re-recorded by Clinton and his band, Funkadelic, and released on various Westbound Records albums during the 1970s.  (Id. at 4)  "The Goose" was recorded by Clinton and another band, Parliament, and released by non-party Casablanca Records in 1974.  (Id.)

Plaintiffs have not alleged that they purchased any copyrights in Compositions or sound recordings from Taylor, Revilot, or any other affiliated entity.  Plaintiffs have instead submitted a series of agreements, dated between 1967 and 1991, in which Clinton, his publishing company, Malbiz Music, and certain co-writers assigned ownership in the Compositions – except as to "The Goose" – to Bridgeport Music and exclusive recording rights to Westbound Records (the "Bridgeport/Westbound Agreements").  (Id. at 4-5)  Plaintiffs further allege that on October 18, 1991, they purchased the rights to "The Goose" from a third-party record label.  (Id. at 6)

Plaintiffs registered the six Compositions with the Copyright Office between the 1970s and early 1990s.  (Id. at 7-8)  In the 1970s, Bridgeport Music also registered the

SPA36

Compositions with Broadcast Music, Inc. ("BMI"), which sells blanket licenses for millions of musical compositions.  As a result of registering the Compositions with BMI, Bridgeport Music has been receiving royalties for the Compositions since that time.  (Id. at 9)

Defendants do not dispute that Taylor did not receive any royalties from BMI in connection with the Compositions.  (Id.)  It is likewise undisputed that Taylor was aware of Westbound Records' sound recordings of the Compositions; as a disc jockey in Detroit, he was provided with those recordings to play on the radio.  (Id.)

Taylor died in 2000 and is survived by Oliver and his four children.  In 2011, Oliver contacted Aaron Fuchs, the owner of Plaintiff TufAmerica, to discuss selling the estate's rights in the Compositions to TufAmerica.  Although Oliver possessed tape recordings of the Compositions, she did not have documents demonstrating that she held rights in the Compositions.  Indeed, when Fuchs asked Oliver if she "had any paperwork that went along" with the tapes, she said that she did not.  (Id. at 9-10)

In an August 9, 2011 agreement (the "TufAmerica Agreement"), TufAmerica paid Oliver $6,500 for a 50% ownership interest in all "worldwide copyright, renewals and/or other rights in and to all musical compositions, sound recordings, and audiovisual records solely owned or controlled by [Oliver, Taylor's estate, and all companies owned or controlled by LeBaron Taylor's Estate, including Revilot Records]. . . ."  (Id. at 10)

On August 15, 2011, after executing the TufAmerica Agreement, Oliver told her attorney that she wanted the following language in the TufAmerica Agreement to be deleted: "[Oliver] warrants and represents that she has valid signed agreements with each and every artist, producer and songwriter and any other copyright holder and/or rights owner associated with these copyrights and that those agreements transfer all right, title, and interest to [Oliver]. . . ."

4

Oliver felt "uncomfortable" making these representations because she had "no written

documents [with respect to the Compositions], just the tapes."  Her attorney then instructed

TufAmerica to remove that language from the TufAmerica Agreement.  (Id.)

      In a December 11, 2017 letter to Plaintiffs – issued more than six years after

signing the TufAmerica Agreement – TufAmerica claimed to own the Compositions and accused

Plaintiffs of infringing TufAmerica's rights in the Compositions.  (Id. at 11)  Plaintiffs filed the

instant case after further exchanges between Plaintiffs and TufAmerica failed to resolve the

parties' dispute concerning ownership of the Compositions.  On December 9, 2019, after this

action was filed, TufAmerica purchased Oliver's remaining 50% interest in the Compositions for

an additional $6,000.  (Id.)

## II.   PROCEDURAL HISTORY

      The Complaint was filed on January 11, 2018, in the Eastern District of Michigan

and seeks a declaratory judgment that (1) Plaintiffs have not infringed upon any copyrights

allegedly owned and/or controlled by Defendants by re-recording, commercially releasing,

and/or otherwise exploiting the Compositions; (2) Plaintiffs are the rightful owners of the

Compositions; and (3) Defendants do not have an interest in the copyrights to the Compositions.

(Cmplt. (Dkt. No. 1))  On February 20, 2019, Defendants' motion to transfer venue was granted

and the case was transferred to this District.  (Dkt. No. 21)  Defendants answered the Complaint

on April 11, 2019, and on May 8, 2019, Defendants filed an amended answer asserting

counterclaims for copyright infringement, an accounting, and a declaratory judgment that

Defendants own the Compositions.  (Dkt. Nos. 28, 32)  Plaintiffs filed an answer to Defendants'

counterclaims on May 29, 2019.  (Dkt. No. 33)  On January 18, 2021, Plaintiffs moved for

summary judgment on both their claims and on Defendants' counterclaims.  (Pltf. Mot. (Dkt. No. 98))

In the July 26, 2023 Summary Judgment Opinion, this Court granted Plaintiffs summary judgment on Defendants' counterclaims, finding that they were time-barred.  Plaintiffs' summary judgment motion was otherwise denied.  (Sum. J. Opin. (Dkt. No. 106) at 32)

In an August 8, 2023 letter, Plaintiffs request "a conditional dismissal of Plaintiff[s'] claims."  (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111))[3]  On August 9, 2023, Defendants moved for reconsideration of this Court's decision granting Plaintiffs summary judgment on Defendants' counterclaims.  (Def. Mot. (Dkt. No. 112))  Defendants state that if this Court denies their "motion [for reconsideration,] so that the dismissal of Defendants' counterclaims is maintained, Defendants will join Plaintiffs' request for conditional dismissal of Plaintiffs' claims."  (Id. at 4 & n.1)

## DISCUSSION

### I.   RECONSIDERATION STANDARD

"Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court."  Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 265 (S.D.N.Y. 2012).  "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"  RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).  "A motion for reconsideration may not be used to advance new facts, issues

---

[3]  In their letter, Plaintiffs do not state what that condition is.  (See id.)  The Court assumes that the dismissal of Plaintiffs' claims would be on the condition that this Court's ruling concerning Defendants' counterclaims is not disturbed on appeal.

or arguments not previously presented to the Court, nor may it be used as a vehicle for

relitigating issues already decided by the Court." Davidson v. Scully, 172 F. Supp. 2d 458, 461

(S.D.N.Y. 2001). "The major grounds justifying reconsideration are 'an intervening change in

controlling law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice.'" Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d

Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478).

"To these ends, a request for reconsideration under Rule 6.3 must demonstrate controlling law or

factual matters put before the court in its decision on the underlying matter that the movant

believes the court overlooked and that might reasonably be expected to alter the conclusion

reached by the court." RST (2005) Inc., 597 F. Supp. 2d at 365 (citing Shrader v. CSX Transp.,

Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

> "[Local] Rule 6.3 is intended to 'ensure the finality of decisions and to prevent the
practice of a losing party . . . plugging the gaps of a lost motion with additional matters.'" Id.
(quoting S.E.C. v. Ashbury Capital Partners, L.P., 2001 WL 604044, at *1 (S.D.N.Y. May 31,
2001)). "A court must narrowly construe and strictly apply Rule 6.3 so as to avoid duplicative
rulings on previously considered issues and to prevent Rule 6.3 from being used to advance
different theories not previously argued, or as a substitute for appealing a final judgment." Id.

## II.   ANALYSIS

> In finding that Defendants' counterclaims are time-barred, this Court concluded
that the counterclaims "accrued either in the 1970s, when Plaintiffs implicitly repudiated
Defendants' ownership of the Compositions, or at the latest in 2011 when Defendants purchased
Oliver's rights in the Compositions." (Sum. J. Opin. (Dkt. No. 106) at 27)

**SPA40**

Defendants argue that, in so concluding, the Court (1) "overlooked" certain "facts," including that Taylor's alleged knowledge of the Westbound Recordings is disputed; (2) improperly determined that Defendants were on inquiry notice, based on (a) Taylor's knowledge that the Compositions were being exploited by another record label, and (b) Defendants' knowledge that Oliver had no paperwork demonstrating an ownership interest in the Compositions; and (3) "overlooked the fact that its split decision regarding statute of limitations will result in the waste of party and judicial resources." (Def. Recon. Br. (Dkt. No. 113) (capitalization altered)).

A.   **Accrual of Taylor's Ownership Claim in the 1970s**

In concluding that Taylor's ownership claim in the Compositions accrued in the 1970s, the Court found as follows:

> For more than thirty years before Taylor's death, Plaintiffs received royalties based on their exclusive registration of the Compositions with BMI. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 78, 84) While "an ownership claim is triggered by knowledge of an entitlement to royalties that are not being paid, rather than by mere knowledge of the exploitation [by another,] . . . learning that another [person or entity] . . . is exploiting the work is sufficient notice that royalties are due." Gary Friedrich Enterprises, LLC, 716 F.3d at 319.

> Here, Taylor had obtained copyright registrations for the Compositions and made and released sound recordings of the Compositions prior to Revilot's bankruptcy. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 17-18; Parness Decl., Exs. G, H, J, L, N, P (Dkt. Nos. 104-7, 104-8, 104-10, 104-12, 104-14, 104-16)) After Revilot's bankruptcy, Clinton and Funkadelic re-recorded the Compositions, and Westbound Records released the new recordings on various albums during the 1970s. (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 36, 42, 49, 56, 64) It is undisputed that, after the Revilot bankruptcy, Taylor worked as a disc jockey in Detroit, and played Westbound's sound recordings of the Compositions on the radio. (Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 20) Accordingly, Taylor was aware that the Compositions were being exploited by another record company. There is no evidence that Taylor ever received royalties in connection with his copyright registrations in the approximately thirty years between Plaintiffs and Casablanca Records' exploitation of the Compositions and Taylor's death. Despite knowing that the Compositions were being publicly exploited, there is no evidence that Taylor ever asserted his ownership rights.

> "Considering the depth of [Taylor's] experience in the music industry," when Clinton and Funkadelic released sound recordings of the Compositions, Taylor had "reason to know" that he had been injured by not receiving royalties for performances of the Compositions, if in fact he believed that he still owned copyrights in the Compositions.  See Mahan v. Roc Nation, LLC, 2015 WL 1782095, at *4 (S.D.N.Y. Apr. 15, 2015), aff'd, 634 F. App'x 329 (2d Cir. 2016) ("[T]he absence of any royalties sent to [p]laintiff [] gave him reason to know of his injury."); see also Howard v. Carter, 615 F. Supp. 3d 190, 195 (W.D.N.Y. 2022), appeal dismissed, 2022 WL 18283303 (2d Cir. Nov. 17, 2022) ("Howard should have known he was not receiving the royalties that he supposedly was entitled to when [the work in question was published and the defendant] 'conspicuously exploit[ed] the copyright[s] without paying royalties.' . . . [His] copyright ownership claim is, therefore, time-barred.") (quoting Gary Friedrich Enterprises, LLC, 716 F.3d at 317).  Accordingly, any claim of copyright ownership by Taylor or a Taylor-affiliated entity would be time-barred.

(Sum. J. Opin. (Dkt. No. 106) at 27-29 (footnotes omitted))

In seeking reconsideration, Defendants argue that this Court mistakenly relied on Defendants' admission in its counterstatement of material facts that Taylor "played Westbound's sound recordings of the Compositions on the radio."  (Def. Recon. Br. (Dkt. No. 113) at 11) According to Defendants, the Court "overlooked" that the corresponding assertion in paragraph 20 of Plaintiffs' Local Rule 56.1 Statement was unsupported.  (Id.)  Defendants made no such argument in their summary judgment briefing.

Having not argued at summary judgment that Plaintiffs' assertion that Taylor "played the Westbound Sound Recordings [of the Compositions] on air [while working as a radio DJ]" (Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 20) was unsupported, Defendants cannot make this argument now.  If correct, this argument was available to Defendants at summary judgment and was not made.  (See Def. Sum. J. Opp. (Dkt No. 103))  As discussed above, reconsideration is only appropriate where the Court overlooked a fact; "[a] motion for reconsideration may not be used to advance new facts, issues or arguments nor previously presented to the Court," Davidson, 172 F. Supp. 2d at 461, nor may such a motion be used to "plug[] the gaps of a lost motion with additional matters."  RST (2005) Inc., 597 F. Supp. 2d at 365.  Accordingly,

9

Defendants' assertion provides no basis for granting reconsideration.  In any event, Plaintiffs' assertions regarding Taylor's knowledge were properly supported and were admitted by Defendants.

Set forth below is Plaintiff's Local Rule 56.1 assertion concerning Taylor's knowledge, as well as Defendants' response:

> 20.  Mr. Taylor worked as a radio DJ in Detroit and played the Westbound Sound Recordings on air.  Busch Decl. ¶ 5 (Deposition of Boladian 18:16-23); Boladian Decl. ¶¶ 15-17.
>
> **Response**: Undisputed.

(Def. R. 56.1 Counterstmt. (Dkt. No. 105) ¶ 20) (emphasis in original))

Paragraphs 15 through 17 of the Boladian Declaration, on which Plaintiffs relied, states:

> 15.  In the 60s and 70s, Taylor was a radio personality and DJ at a local Detroit radio station, WCHB in Inkster, Michigan.
>
> 16.  When Taylor worked at the radio station, I would take him Westbound records to play and promote them at the radio station he worked for, along with other radio stations in Detroit.
>
> 17.  I took him the sound recordings that Clinton recorded for Westbound to play and promote at his radio station.

(Boladian Decl. (Dkt. No. 100-1) at 163-64)

Plaintiffs' statement in paragraph 20 of their Local Rule 56.1 statement regarding Taylor's knowledge of the Westbound Recordings is fully supported by Boladian's declaration, in which Boladian states that he took "the sound recordings that Clinton recorded for Westbound" to Taylor "to play and promote at his radio station."  (Id.)  The significance of Taylor's playing of the Compositions – which Defendants admitted was "undisputed" – is that "Taylor was aware that the Compositions were being exploited by another record company." (Sum. J. Opin. (Dkt. No. 106) at 28)  As discussed above and in the Summary Judgment

Opinion, because of Taylor's knowledge, Defendants' copyright counterclaims accrued "[i]n the 60s and 70s," when Boladian gave Taylor the Westbound Recordings to play at his radio station. (Id.)  In sum, in their Local Rule 56.1 Counterstatement, Defendants admitted the facts that they now seek to dispute, and their complaint about this Court's decision to rely on their admission provides no basis for granting reconsideration.

Moreover, Taylor's knowledge – "in the 60s and 70s" – that Westbound was exploiting the Compositions is binding on Defendants.  "[A] co-owner is aware of his claim of co-ownership from the moment the work is created, and thus, learning that another [] is exploiting the work is sufficient notice that royalties are due."  Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302, 319 (2d Cir. 2013) (citation omitted).  The "knowledge of an entitlement to royalties that are not being paid" triggers the accrual of a "[copyright] ownership claim."  Id.  Because Taylor became aware "during the 1970s" (Sum. J. Opin. (Dkt. No. 106) at 28) that Westbound was exploiting the Compositions, he had "knowledge [at that time] of [his] entitlement to royalties."  Gary Friedrich Enterprises, 716 F.3d at 317.  Indeed, as an experienced record executive, Taylor was then on notice that he was "'entitled to royalties that [he was] not receiving.'"  Mahan v. Roc Nation, LLC, 2015 WL 1782095, at *4 (S.D.N.Y. Apr. 15, 2015), aff'd, 634 F. App'x 329 (2d Cir. 2016) (quoting Gary Friedrich Enterprises, 716 F.3d at 317).

Defendants also repeat their argument that Clinton's deposition testimony that he "told Boladian – at an unspecified time – that Groovesville and Revilot had published the Compositions" (Sum. J. Opin. (Dkt. No. 106) at 31), creates a material issue of fact with respect to the accrual of Taylor's ownership claim.  (Def. Recon. Br. (Dkt. No. 113) at 13-14)  But this Court addressed this same argument in the Summary Judgment Opinion, and concluded that

**SPA44**

Clinton's testimony on this point is "irrelevant to whether Taylor's ownership of the Compositions was ever publicly, privately, or implicitly repudiated by Plaintiffs," thereby triggering the statute of limitations.  (Sum. J. Opin. (Dkt. No. 106) at 31)  In sum, Plaintiffs' argument on this point provides no basis for granting reconsideration, see Davidson, 172 F. Supp. 2d at 461 ("A motion for reconsideration may not be used . . . as a vehicle for relitigating issues already decided by the Court."), and – in any event – Clinton's testimony is not probative as to Taylor's knowledge of the Westbound Recordings because it says nothing about Taylor's knowledge of the Westbound Recordings.

      **B.**    **Accrual of Defendants' Ownership Claim in 2011**

      Defendants next contend that "the Court overlooked and therefore misapprehended facts concerning the events in 2011."  (Def. Recon. Br. (Dkt. No. 113) at 8 (capitalization altered))  Defendants do not say what facts the Court overlooked, however. Instead, they attempt to distinguish Kwan v. Schlein, 634 F.3d 224, 226 (2d Cir. 2011), a case this Court cited for, inter alia, the proposition that "[a copyright] 'ownership claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'"  (Sum. J. Opin. (Dkt. No. 106) at 22 (quoting Kwan, 634 F.3d at 228))

      The Court concluded that Defendant TufAmerica was on "inquiry notice" when it purchased Oliver's rights in the Compositions, citing the following undisputed facts:  (1) Oliver told TufAmerica "that she did not have 'any paperwork' confirming her ownership interest in the Compositions" id. at 29 (citing Def. R. 56.1 Stmt. (Dkt. No. 105) ¶¶103-07, 110); (2) "after signing the agreement with TufAmerica, Oliver . . . [asked] TufAmerica to remove . . . from the TufAmerica Agreement" certain "representations and warranties" that she had "valid signed agreements" showing transfer of title to Oliver (id. at 29-30 (citing Busch Decl., Ex. 11 (Dkt. No.

# SPA45

100-1) at 105; Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 113-14); (3) Aaron Fuchs, TufAmerica's

owner, considered "search[ing] the copyright catalog for registrations" at the time he purchased a

50% share of Oliver's interest in the Compositions in 2011, but decided not to, and did not

conduct such a search until a "few years" later (id. at 30); and (4) Fuchs' purchase of a "50%

ownership stake in 'all worldwide copyright, renewals, and/or other rights in certain musical

works' created by one of the most celebrated funk musicians of all time" for only $6,500.  (Id. at

31 (quoting Pltf. R. 56.1 Stmt. (Dkt. No. 100) ¶ 111)  Finally, the Court observed that "[a]s the

owner and operator of a record label, Fuchs . . . [has] substantial 'experience in the music

industry.'"  Given all of these circumstances, the Court concluded that Fuchs and TufAmerica

were "on inquiry notice that another party might have claimed ownership of the Compositions."

(Id.)

         In moving for reconsideration, Defendants argue that the "facts of the present case

are significantly different" from Kwan.  (Def. Recon. Br. (Dkt. No. 113) at 8-9)  But the

Summary Judgment Opinion does not analogize the facts of the instant case to those in Kwan.

Instead, as discussed above, this Court cites Kwan for a purely legal point:  when a claim for

copyright ownership accrues.

         Defendants argue, however, that Kwan has no application here because – unlike

in Kwan – the statute of limitations is being applied against a "senior copyright holder."  (Id.)

According to Defendants, "[the] senior copyright holder should not be placed on inquiry notice

without substantial evidence of repudiation."  (Def. Recon. Br. (Dkt. No. 113) at 8-11

(capitalization altered))  As discussed above and in the Summary Judgment Opinion, however,

that is ample evidence of repudiation here.  In any event, Defendants ignore the fact that

"[c]ourts treat the Copyright Act's statute of limitations as 'something like adverse possession

[for] copyright ownership.'"  (Sum. J. Opin. (Dkt. No. 106) at 24 (quoting Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir. 1996))

Here, the undisputed facts demonstrate that Taylor sat on whatever copyright interests he retained following Revilot's bankruptcy for more than thirty years.  It is likewise undisputed that, in that time, Plaintiffs re-recorded the Compositions, released the Westbound Recordings to the public – with Taylor's knowledge – and were the exclusive beneficiaries of royalties in connection with the Compositions.  Given these circumstances and the ample evidence of repudiation, finding that Defendants' counterclaims are time-barred is fully consistent with "'Congress's paramount goal in revising the 1976 Act [of] enhancing [the] predictability and certainty of copyright ownership.'"  Id. (quoting Zuill, 80 F.3d at 137).

Finally, Defendants did not raise their "senior copyright holder" argument at summary judgment, and a motion for reconsideration "may not be used to advance new . . . arguments not previously presented to the Court."  Davidson, 172 F. Supp. 2d at 461.

C.     **Waste of Party and Judicial Resources**

Defendants also contend that reconsideration is necessary because the Summary Judgment Opinion "will result in the waste of party and judicial resources."  According to Defendants, the Court's opinion "force[s] the parties to go through a trial that benefits neither side." (Def. Recon. Br. (Dkt. No. 113) at 6)

But in determining that Defendants' counterclaims are time-barred, this Court merely applied the applicable law.  This Court cannot decline to apply the law merely because a particular litigation is wasteful and unlikely to be productive.  It was the parties' choice to proceed with this litigation, and it will be the parties' decision whether it continues.  For the Court's part, the presence of material issues of fact – as explained in the Summary Judgment

**SPA47**

Opinion (Sum. J. Opin. (Dkt. No. 106) at 14-21) preclude ruling as a matter of law on Plaintiffs'

claims.[4]

### III.   INTERLOCUTORY APPEAL

Defendants request permission to pursue an interlocutory appeal under 28 U.S.C.

§ 1292(b) in the event that their motion for reconsideration is denied.  (Def. Recon. Br. (Dkt. No.

113) at 14)  Interlocutory appeals are presumptively disfavored, and only "'exceptional

circumstances justify a departure from the basic policy of postponing appellate review.'"

Martens v. Smith Barney, 238 F. Supp. 2d 596, 599 (S.D.N.Y. 2002) (quoting Coopers v.

Livesay, 437 U.S. 463, 475 (1975)); see also Prout v. Vladeck, 319 F. Supp. 3d 741, 746

(S.D.N.Y. 2018) (interlocutory appeals are "rare, and reserved for exceptional circumstances")

(internal quotation marks omitted).  Indeed, the "Second Circuit has 'urge[d] the district courts to

exercise great care in making a § 1292(b) certification,'" Santiago v. Pinello, 647 F. Supp. 2d

239, 243 (E.D.N.Y. 2009) (quoting Westwood Pharmaceuticals, Inc. v. National Fuel Gas Dist.

Corp., 964 F.2d 85, 88-89 (2d Cir. 1992)), because "§ 1292(b) is a 'rare exception to the final

judgment rule that generally prohibits piecemeal appeals.'"  Id. (quoting Koehler v. The Bank of

Bermuda, Ltd., 101 F.3d 863, 865-66 (2d Cir. 1996)); see also Williston v. Eggleston, 410 F.

Supp. 2d 274, 276 (S.D.N.Y. 2006) ("'Interlocutory appeal was not intended as a vehicle to

---

[4]  Defendants' citation to Stevens v. City of New York, 2012 WL 5862659, at *1 (S.D.N.Y. Nov. 14, 2012) and similar cases is misguided.  (Def. Recon. Br. (Dkt. No. 113) at 7)  While Judge Forrest granted reconsideration in that case based on "a legal argument not [] raised" at summary judgment, she did so because defendant's argument was "clearly correct" and disposed of certain of plaintiffs' claims.  Stevens, 2012 WL 5862659, at *1.  Judge Forrest overlooked defendant's failure to raise that argument, despite the "strict" standard on a motion for reconsideration, because if "the Court [did] not [] revisit its earlier decision, the outcome of the issue is so clear that the Court would have to grant a motion for directed verdict on the same basis at the close of plaintiff's case."  Id.  There are no such circumstances here.  For the reasons explained above, the arguments raised by Defendants in seeking reconsideration have no merit.

**SPA48**

provide early review of difficult rulings in hard cases. . . . The benefit to the district court in

avoiding an unnecessary trial must be weighed against the inefficiency of having the Court of

Appeals hear multiple appeals in the same case.'") (quoting Wausau Bus. Ins. Co. v. Turner

Const. Co., 151 F. Supp. 2d 488, 492 (S.D.N.Y. 2001)).  Accordingly, under 28 U.S.C.

§ 1292(b), a district court may certify an order for interlocutory appeal only if it concludes that

"(1) the order 'involves a controlling question of law;' (2) 'as to which there is substantial

ground for difference of opinion;' and (3) 'that an immediate appeal of the order may materially

advance the ultimate termination of the litigation.'"  Martens, 238 F. Supp. 2d at 599 (quoting 28

U.S.C. § 1292(b)).

      "[T]he party seeking an interlocutory appeal has the burden of showing

'exceptional circumstances,'" and showing that each of § 1292(b)'s requirements are met.

Williston, 410 F. Supp. 2d at 276 (citations omitted).  "The [ultimate] determination of whether

§ 1292(b) certification is appropriate under these standards lies within the discretion of the

district court."  Martens, 238 F. Supp. 2d at 599.  "[E]ven if a 'district court concludes that the

three factors in § 1292(b) are met, it nevertheless retains unfettered discretion to deny leave to

appeal.'"  Green v. Humana at Home, Inc., 2019 WL 3729390, at *3 (S.D.N.Y. Aug. 8, 2019)

(quoting Frederick v. New York City, 2013 WL 310441, at *5 (S.D.N.Y. Jan. 24, 2013)).

      Defendants argue that this Court should certify an interlocutory appeal because

"trial would have little practical value to Plaintiffs even if they prevail . . . and no practical value

if they do not prevail."  (Def. Recon. Br. (Dkt. No. 113) at 14)  Regardless of the outcome at

trial, Defendants state they will appeal the Court's statute of limitations ruling, thereby leading to

the vain expenditure of "'substantial resources.'"  (Id. at 14-15 (quoting In re Dynex Cap., Inc.

Sec. Litig., 2006 WL 1517580, at *2 (S.D.N.Y. June 2, 2006))

    In seeking permission to pursue an interlocutory appeal, Defendants make no

effort to satisfy that first two prongs of the certification test:  they do not argue that this case

"involves a controlling question of law[]' [] 'as to which there is substantial ground for

difference of opinion.'"  Martens, 238 F. Supp. 2d at 599 (quoting 28 U.S.C. § 1292(b); see also

Whyte v. Wework Companies, Inc., 2020 WL 4383506, at *2 (S.D.N.Y. July 31, 2020) ("The

trouble is that Plaintiff has not shown a substantial ground for difference of opinion on [a]

question [of law].  'A substantial ground for difference of opinion exists where (1) there is

conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression

for the Second Circuit.'") (quoting Youngers v. Virtus Inv. Partners Inc., 228 F. Supp. 3d 295,

299 (S.D.N.Y. 2017)).  While Defendants disagree with the Court's conclusion that their claims

are time-barred, "the mere presence of a disputed issue . . . is insufficient to demonstrate a

substantial ground for difference of opinion."  In re Flor, 79 F.3d 281, 284 (2d Cir. 1996).[5]

    Finally, while district courts "'have found that certification under section 1292

will materially advance the ultimate termination of the litigation when reversal would end the

litigation,'" Analect LLC v. Fifth Third Bancorp, 2009 WL 2568540, at *5 (E.D.N.Y. Aug. 19,

2009) (quoting In re Methyl Tertiary Butyl Ether Prod. Liab. Litig., 2008 WL 2511038, at *5

---

[5] In re Dynex Cap., Inc. Sec. Litig., 2006 WL 1517580, at *2, cited by Defendants (Def. Recon.
Br. (Dkt. No. 113) at 14-15), does not support their application for permission to pursue an
interlocutory appeal.  Indeed, that case shows why their request is unfounded.  In In re Dynex,
the district court found that "defendants have demonstrated that the permissibility of pleading
corporate or collective scienter within this Circuit constitutes 'a controlling question of law as to
which there is substantial ground for difference of opinion.'"  In re Dynex, 2006 WL 1517580, at
*2 (quoting 28 U.S.C. § 1292(b)).

# SPA50

(S.D.N.Y. June 18, 2008)), reversal would not end the litigation here, because the case would then be remanded for trial as to copyright ownership of the Compositions.

In sum, Defendants have not met their burden to show "exceptional circumstances" justifying the certification of an interlocutory appeal under Section 1292(b). Martens, 283 F. Supp. 2d at 599.  Accordingly, their application is denied.

## IV.   CONDITIONAL DISMISSAL

In an August 8, 2023 letter, Plaintiffs state that "[t]he sole reason this action was filed has now been mooted by the Court's dismissal of Defendant[s'] counterclaims," and request dismissal of their claims conditional on "the outcome of Defendant[s'] . . . appeal" of the Summary Judgment Opinion under Purdy v. Zeldes, 337 F.3d 253 (2d Cir. 2003).  (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111) at 1)  Defendants join in Plaintiffs' application.  (See Def. Recon. Br. (Dkt. No. 113) at 4 n.1)  Regardless of the outcome at trial, Defendants state that they will "take up an appeal of [the] final judgment in order to take up an appeal of the non-final July 26, 2023 [Summary Judgment Opinion], the goal being to secure a reversal so that they can go to trial with a jury empowered to affirmatively decide whether TufAmerica owns the copyrights."  (Id. at 6)

The Court construes Plaintiffs' "request" (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111)) as a motion for voluntary dismissal under Fed. R. Civ. P. 41(a)(2).  Rule 41(a)(2) provides as follows:

> Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. . . . Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed. R. Civ. P. 41(a)(2).

The Second Circuit has articulated five factors that district courts should consider when addressing a motion for voluntary dismissal under Rule 41(a)(2):

> "(1) the plaintiff's diligence in bringing the motion; (2) any undue vexatiousness on plaintiff's part; (3) the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; (4) the duplicative expense of relitigation; and (5) the adequacy of plaintiff's explanation for the need to dismiss."

Podlin v. Ghermezian, 2014 WL 3844629, at *1 (S.D.N.Y. July 29, 2014), aff'd, 601 F. App'x 31

(2d Cir. 2015) (quoting Zagano v. Fordham Univ., 900 F.2d 12, 14 (2d Cir.1990))

Plaintiffs submitted their request for a conditional dismissal on August 8, 2023, shortly after this Court's July 26, 2023 Summary Judgment Opinion was issued.  (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111))  There is no claim here that Plaintiffs have acted vexatiously in seeking a conditional dismissal.  Indeed, Plaintiffs support Defendants' application.  Both Plaintiffs and Defendants have expressed a strong desire to avoid trial, and both have stated that their dispute will be resolved by a Second Circuit decision addressing this Court's ruling that Defendants' counterclaims are time-barred.  (Id. at 2 ("[Conditional dismissal] will [] conserve the resources of both parties and the Court."); Def. Recon. Br. (Dkt. No. 113) at 5-6 ("[T]he practical effect of the [Summary Judgment Opinion] is to force the parties to go through a trial that benefits neither side, but which Defendants must go through in order to appeal the very point on which they now seek reconsideration [], namely, the timeliness of their counterclaims.") (emphasis in original))  There appears to be little risk of duplicative litigation.  Finally, a Second Circuit ruling that Defendants' counterclaims are time-barred would end the litigation without the need for a trial.  And Defendants represent that – if they are not permitted to lay their counterclaims before the Second Circuit now – they will appeal this Court's statute of limitations ruling after trial.

"[W]hen a plaintiff is completely free to relitigate voluntarily dismissed claims, the final judgment rule ordinarily precludes [a Court of Appeals] from reviewing any adverse determination by the district court in that case."  Purdy, 337 F.3d at 258.  Purdy holds, however,

**SPA52**

that "where, as here, a plaintiff's ability to reassert a claim is made conditional on obtaining a reversal from this court, the finality rule is not implicated in the same way. . . . [T]herefore [] a conditional waiver . . . creates a final judgment reviewable by [a Court of Appeals]."  Id.; Podlin, 2014 WL 3844629, at *2.

In Purdy, it was plaintiff who sought to appeal an order granting the defendants summary judgment as to some, but not all, of plaintiff's claims.  Purdy, 337 F.3d at 255 ("The [district] court granted summary judgment to defendants only on [two of] Purdy's [] claims . . . [and] denied summary judgment without prejudice [as to a malpractice claim] . . . . Purdy runs the risk that if his appeal is unsuccessful, his malpractice case comes to an end.").  Here, Plaintiffs wish to condition dismissal of their claims on the outcome of Defendants' appeal. (Pltf. Aug. 8, 2023 Ltr. (Dkt. No. 111) at 1-2)

The Court sees no reason why this factual distinction should make a difference. Here, as in Purdy, Plaintiffs "run[] the risk" that their claims will be dismissed with prejudice if Defendants' appeal of the Summary Judgment Opinion is unsuccessful.  Plaintiffs' "ability to reassert a claim is [still] conditional on [] a reversal" by the Second Circuit, thereby "creat[ing] a final judgment reviewable" by the Second Circuit.  Purdy, 337 F.3d at 258.

Plaintiffs' request for a conditional dismissal is therefore granted.  By September 12, 2023, the parties will jointly file a proposed stipulation and order providing that Plaintiffs' claims are dismissed with prejudice, except that if the Second Circuit reverses this Court's ruling in the Summary Judgment Opinion that Defendants' counterclaims are time-barred, Plaintiffs' claims will have been dismissed without prejudice.

SPA53

<u>**CONCLUSION**</u>

For the reasons stated above, Defendants' motion for reconsideration is denied.

The Clerk of Court is directed to terminate the motion (Dkt. No. 112).  Plaintiffs' request for

conditional dismissal (Dkt. No. 111) is granted as set forth above.

Dated:  New York, New York
       September 10, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge

21

**SPA54**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

BRIDGEPORT MUSIC, INC. and            :
WESTBOUND RECORDS, INC.,
                                      :
          Plaintiffs,
                                      :
     -against-                            Case No. 19-cv-01764-PGG
                                      :
TUFAMERICA, INC. d/b/a TUFF CITY      :
RECORDS, and KAY LOVELACE
TAYLOR, individually and on behalf of :
the Estate of LeBaron Taylor,
                                      :
          Defendants.                 :

------------------------------------- X

<u>ORDER CONDITIONALLY DISMISSING PLAINTIFFS' CLAIMS</u>

WHEREAS the Parties have filed a Joint Stipulation of Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2); and

WHEREAS the Court finds it is well taken;

NOW THEREFORE **IT IS SO ORDERED** that the claims brought by Bridgeport Music, Inc. and Westbound Records, Inc. are conditionally dismissed without prejudice, but that if this Court's ruling is reversed, Plaintiffs' claims will be reinstated as of the date of the original filing of the Complaint. If the Second Circuit affirms this Court's dismissal of Defendants' counterclaims, Plaintiffs claims will be deemed dismissed with prejudice.

The Clerk of Court is directed to close the case.

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge
 Date:  September 15, 2023